Filed 12/4/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S209957 |
| v. | ) | |
| | ) | Ct.App. 4/2 E054600 |
| JONIS CENTENO, | ) | |
| | ) | San Bernardino County |
| Defendant and Appellant. | ) | Super. Ct. No. FVA801798 |
| _____ | ) | |

Courts have repeatedly cautioned prosecutors against using diagrams or visual aids to elucidate the concept of proof beyond a reasonable doubt (see, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 744-745 (*Medina*); *People v. Otero* (2012) 210 Cal.App.4th 865, 874 (*Otero*); *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1269 (*Katzenberger*)), yet these arguments persist.  Here, the prosecutor used a diagram showing the boundaries of California and urged the jury to convict based on a "reasonable" view of the evidence.  The argument unduly risked misleading the jury about the standard of proof.  The judgment is reversed.

## I.  BACKGROUND

Defendant lived in a garage that had been converted into two living spaces. Seven-year-old Jane Doe lived in the other section of the garage with her father and brother.  Defendant's space did not have a door.

In March 2008, child protective services received an anonymous report that Jane was being neglected by her father and may have been sexually abused by defendant. Sheriff's deputies investigated.

Jane's father initially told deputies that he had passed defendant's room and saw Jane on the bed with defendant lying on top of her. When the father entered, defendant "quickly jumped off," and Jane ran out. Later, Jane's father and the landlady confronted defendant, asking whether anything inappropriate had transpired. Defendant said no. But, to avoid future problems, he agreed to have no contact with Jane or her brother.

Jane made an initial statement to a deputy at her elementary school. That interview was neither recorded nor introduced into evidence.

Defendant told a deputy the encounter was innocent. He and Jane were playing in his room. Jane threw a ball at him, then ran up and hugged him as he sat on the edge of the bed. Defendant lost his balance and rolled onto her. The father walked in just as defendant was getting up.

In a subsequent forensic interview, Jane said that defendant had touched her improperly four times. During three of the incidents, defendant lay on top of her, not moving. Both were clothed. During the fourth incident, defendant exposed his penis and placed it against her. Jane did not see or feel defendant's penis, but believed it was exposed because she heard him lower his zipper. A video recording of this interview was introduced into evidence.

At trial, Jane was nearly 10 years old. She repeatedly denied that defendant had lain on top of her or otherwise touched her improperly. When asked if she "remember[ed] telling the police officers that . . . there were four times [defendant] touched [her] in a way [she] didn't like," she exclaimed, "That's not true." She did not remember making any such report. When pressed about her previous statements, Jane began to cry, and the court recessed for the day.

2

The next day the prosecutor asked, "Did [defendant] lay on top of you and you're just too embarrassed to talk about it?" Jane replied, "Yes." In a series of primarily leading questions, Jane confirmed that defendant had lain on top of her twice. The first time, Jane lay facedown, saw defendant expose his penis, then felt it touching her. The second time, Jane lay on the floor facing up as defendant lay on top of her. It was then that her father interrupted them.

Jane refused to answer many of the prosecutor's questions on direct examination. On cross-examination, she refused to answer any questions about the charged offenses. The transcript of her testimony reveals that at least 75 times she gave no response to direct and cross-examination questions. Defense counsel's last inquiry was: "All the questions that [the prosecutor] asked yesterday and today, are they confusing you? Are they cluttering your mind? Are they hard to put them all together? Are they confusing you?" Jane responded, "Yes."

Although called by the prosecution, Jane's father testified he did not see defendant lie on top of her, nor did he tell investigators he had seen defendant do so. He described seeing Jane, her brother, and defendant all trying to grab a ball or a piece of candy on the floor. He did not confront defendant about the incident at the time or report it to law enforcement, stating that "[t]here was no reason." He and his children moved from the residence because there were several men renting various spaces on the property and he felt it was inappropriate for his children to enter their rooms.

Defendant's father was a pastor at the church Jane's father attended. Jane's family was given various types of assistance from church members, including money, clothing, shoes, food, and transportation. The pastor did not talk to Jane's father about the case or have any influence on his testimony.

Defendant testified that one day he, Jane, and her brother were playing with a ball in his room. They were all laughing and all reached for the ball at the same time. When Jane's father came by, he saw them "all bunched up" on the floor and told the children to leave. Defendant denied having lain on top of Jane on that occasion or any other.

In closing argument, defense counsel focused on the reasonable doubt standard from his opening remarks and vigorously attacked the People's case. He pointed out the anonymity of the report that gave rise to the investigation, the absence of testimony from several logical witnesses, and the lack of corroborating evidence. He focused on inconsistencies in the evidence and Jane's repeated denials, during her first day of testimony, that anything improper took place. He urged that Jane was confused and afraid and that "there [was] a whole litany of things she couldn't see, hear, or perceive." His theme of argument was that the whole case was one of missing evidence, missing links, and missing pieces that gave rise to reasonable doubt.

In rebuttal, the prosecutor also focused on reasonable doubt and asked the jury to consider a hypothetical criminal trial. Displaying a diagram showing the geographical outline of California, she characterized the issue in that hypothetical trial as "[W]hat state is this?" She then laid out hypothetical "testimony" given by witnesses that contained inconsistencies, omissions, and inaccuracies, but urged that, even had the jurors heard such evidence, they would have no reasonable doubt that the state was California. Turning to the facts of the case, the prosecutor argued that either defendant had lain on top of Jane or that nothing improper had happened at all. The jury's essential task, the prosecutor urged, was to decide which version of the facts was true. To that end, the prosecutor argued that defendant's testimony was unreasonable, and conversely that the People's burden was met if its theory was "reasonable" in light of the facts supporting it.

4

The jury convicted defendant of two counts of committing lewd acts on a child under the age of 14,[1] and one misdemeanor count of annoying or molesting a child under the age of 18.[2] He was sentenced to five years in prison.

## II. DISCUSSION

The trial court gave the majority of its instructions the day before closing arguments. Those instructions included CALCRIM No. 220, describing the presumption of innocence and the prosecutor's burden of proving guilt beyond a reasonable doubt.[3]

The next day, in rebuttal, the prosecutor used a visual display attempting to illustrate the standard of proof. The presentation itself was not made a part of the appellate record. However, the prosecutor referred in some detail to its content, and the appellate court relied on the transcript of argument to resolve defendant's claim of error. The argument proceeded as follows:

---

[1] Penal Code section 288, subdivision (a). All further statutory references are to the Penal Code.

[2] Section 647.6, subdivision (a)(1).

[3] Specifically, it provided: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

"Let me give you a hypothetical.  Suppose for me that there is a trial, and in a criminal trial, the issue is what state is this that is on the Elmo.[4]  Say you have one witness that comes in and this witness says, hey, I have been to that state, and right next to this state there is a great place where you can go gamble, and have fun, and lose your money.  The second witness comes in and says, I have been to this state as well, and there is this great town, it is kind of like on the water, it has got cable cars, a beautiful bridge, and it is called Fran-something, but it is a great little town.  You have another witness that comes in and says, I have been to that state, I went to Los Angeles, I went to Hollywood, I saw the Hollywood sign, I saw the Walk of Fame, I put my hands in Clark Gable's handprints in the cement.  You have a fourth witness who comes in and says, I have been to that state.

"What you have is you have incomplete information, accurate information, wrong information, San Diego in the north of the state, and missing information, San Bernardino has not even been talked about, but is there a reasonable doubt that this is California?  No.  You can have missing evidence, you can have questions, you can have inaccurate information and still reach a decision beyond a reasonable doubt.  What you are looking at when you are looking at reasonable doubt is you are looking at a world of possibilities.  There is the impossible, which you must reject, the impossible [*sic*] but unreasonable, which you must also reject, and the reasonable possibilities, and your decision has to be in the middle.  It has to be based on reason.  It has to be a reasonable account.  And make no mistake about it, we talked about this in jury selection, you need to look at the entire

---

**4**     It appears from this reference that the prosecutor was projecting an image onto a screen using an ELMO brand projector.  Both defendant and the Court of Appeal inferred from the prosecutor's description that the image depicted an outline of California.  The People have not contested this point.  Accordingly, we likewise adopt this inference.  (Cal. Rules of Court, rule 8.500(c).)

picture, not one piece of evidence, not one witness. You don't want to look at the tree and ignore the forest. You look at the entire picture to determine if the case has been proven beyond a reasonable doubt."

Comparing the prosecution and defense evidence, the prosecutor argued: "Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers or the defendant abused Jane Doe. That is what is reasonable, that he abused her. [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?" She continued: "Is it reasonable to believe that there is an innocent explanation for a grown man laying on a seven year old? No, that is not reasonable. Is it reasonable to believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant or he['s] good for it? That is what is reasonable. He's good for it."

Defense counsel did not object to these arguments or request that the jury be admonished to disregard them. As a consequence, the trial court did not comment on them. On appeal, defendant urges his conviction must be reversed because the prosecutor committed misconduct, and his counsel was constitutionally ineffective for failing to object.

A. *Misstatement of the Reasonable Doubt Standard in Closing Argument*

Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 702 (*Mendoza*).) However, "it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its

. . . obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831 (*Marshall*); accord, *People v. Hill* (1998) 17 Cal.4th 800, 829 (*Hill*).) To establish such error, bad faith on the prosecutor's part is not required. (*Hill*, at pp. 822-823.) "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*Id.* at p. 823, fn. 1.)

When attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" (*Marshall, supra,* 13 Cal.4th at p. 831), there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard. (See *People v. Johnson* (2004) 119 Cal.App.4th 976, 985-986; *People v. Garcia* (1975) 54 Cal.App.3d 61, 63.) We have recognized the "difficulty and peril inherent in such a task," and have discouraged such " 'experiments' " by courts and prosecutors. (*Medina, supra,* 11 Cal.4th at p. 745.) We have stopped short, however, of categorically disapproving the use of reasonable doubt analogies or diagrams in argument. Rather, we assess each claim of error on a case-by-case basis.

In *Medina, supra,* 11 Cal.4th 694, this court reviewed the prosecutor's use of a diagram during voir dire to illustrate the standard of proof. The diagram depicted two horizontal lines, one labeled " '100 percent certainty' " and a second

8

line beneath it labeled " 'beyond a reasonable doubt.' " (*Id*. at p. 744.)  The prosecutor emphasized that the jurors should not hold him to the highest standard, but rather to the " 'lower' " standard, and indicated that a conviction could be reached if the juror simply " 'cross[es] this black line . . . in your head, of course . . . .' " (*Ibid*.)  We cautioned against the prosecutor's "attempt to reduce the concept of guilt beyond a reasonable doubt to a mere line on a graph or chart." (*Id*. at p. 745.)  We ultimately concluded that no prejudicial misconduct was shown because the seated jury was properly instructed on the standard of proof, and the prosecutor's voir dire remarks were made before evidence was received and formal instructions given.  (*Ibid*.)

In *Katzenberger, supra,* 178 Cal.App.4th 1260, the Court of Appeal disapproved of an argument similar to that made here.  During closing argument, the prosecutor used a slide show to display pieces of a puzzle.  As six pieces of the puzzle came onto the screen, the picture became "immediately and easily recognizable as the Statue of Liberty" (*id*. at p. 1264), even though two pieces that would have shown part of the statue's face and the torch were missing (*id*. at pp. 1264-1265).  Over defense objection, the prosecutor argued, " '[w]e know [what] this picture is beyond a reasonable doubt without looking at all the pieces of that picture.  We know that that's a picture of the Statute of Liberty, we don't need all the pieces of the [*sic*] it.' " (*Id*. at p. 1265.)

The appellate court concluded that the presentation misrepresented the standard of proof.  As relevant here, it observed, "The Statue of Liberty is almost immediately recognizable in the prosecution's PowerPoint presentation.  Indeed, some jurors might guess the picture is of the Statute of Liberty when the first or second piece is displayed. . . . [and] . . . most jurors would recognize the image well before the initial six pieces are in place." (*Katzenberger, supra*, 178 Cal.App.4th at pp. 1266-1267.)  The court reasoned that the presentation invited

9

the jurors to guess or jump to a conclusion without considering all of the evidence, an approach "completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Id*. at p. 1267.)

The Court of Appeal deemed the error harmless, however. Defense counsel had argued vigorously against the prosecutor's analogy, and the trial court reread the reasonable doubt instruction to " 'clarify' " the issue. (*Katzenberger, supra*, 178 Cal.App.4th at pp. 1268-1269.) Additionally, evidence of the defendant's guilt was strong. (*Id*. at p. 1269.) The appellate court nonetheless expressly "caution[ed] prosecutors who are tempted to enliven closing argument with visual aids that using such aids to illustrate the 'beyond a reasonable doubt' standard is dangerous and unwise." (*Id*. at p. 1269.)

In *Otero, supra,* 210 Cal.App.4th 865, the court disapproved the prosecutor's use of a diagram similar to the one used here to illustrate proof beyond a reasonable doubt. At the top of the diagram was printed " 'No Reasonable Doubt.' " (*Id*. at p. 869.) The diagram depicted the outlines of California and Nevada with a dollar sign in southern Nevada and the word " 'Ocean' " printed to the left of California. Inside California, " 'San Diego' " was printed in the northern part of the state; just below was a star with the word " 'Sac.' ";  below that was " 'San Francisco' "; and even further south was " 'Los Angeles.' " At the bottom was a statement:  " 'Even with incomplete and incorrect information, no reasonable doubt that this is California.' " (*Ibid*.) Using the diagram, the prosecutor told the jury, " 'I'm thinking of a state and it's shaped like this. And there's an ocean to the left of it, and I know that there's another state that abuts this state where there's gambling. Okay. And this state that I'm thinking about, right in the center of the state is a city called San Francisco, and in the southern portion of the state is a city called Los Angeles. And I think the capital is Sac-something. And up at the northern part of the state there's a city

10

called San Diego. I'm just trying to figure out what state this might be." "Is there any doubt in your mind, ladies and gentlemen, that that state is California? Okay. Yes, there's inaccurate information. I know San Diego is not at the northern part of California, and I know Los Angeles isn't at the southern. Okay. But my point to you in this—' " (*Id*. at pp. 869-870.) The trial court sustained defense counsel's objection, told the jurors to disregard the diagram, and referred them to the definition of reasonable doubt provided in the instructions. (*Id*. at p. 870.)

The Court of Appeal found that the prosecutor's argument was improper. It reasoned that when the prosecutor said she was thinking of a state " 'shaped like this' " and pointed to the outline of California, "[a]t that point without considering anything else on the slide . . . we think every juror knew the state was California." (*Otero, supra*, 210 Cal.App.4th at p. 872.) The outline of California itself was so readily identifiable that the jurors would have known what they were looking at based on the graphic alone, encouraging them to jump to a conclusion. (*Id*. at pp. 872-873.) The court observed that "use of a diagram such as the one used in this case is simply not an accurate analogy to a prosecutor's burden to prove beyond a reasonable doubt each and every element of a charged offense." (*Id*. at p. 873.) It found the error harmless, however, because the trial court admonished the jury to disregard the diagram and properly instructed on proof beyond a reasonable doubt. The court also relied on the strength of the prosecutor's case. (*Id*. at pp. 873-874.) Nonetheless, it stressed that "[p]rosecutors would be wise to avoid such devices. Otherwise a conviction on a closer case may be jeopardized, especially if the trial court does not sustain defense counsel's objection to the argument and fails to advise the jury to disregard the objected to presentation." (*Id*. at p. 874.)

We agree with *Katzenberger* and *Otero*. The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable

11

doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial. They are immediately recognizable and irrefutable. Additionally, such demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion.

A criminal trial is regulated by rules of procedure. A jury may only decide the issue of guilt based on the evidence presented at trial, with the presumption of innocence as its starting point. Although the jurors may rely on common knowledge and experience in *evaluating* the evidence (*People v. Leonard* (2007) 40 Cal.4th 1370, 1414), they may not go beyond the record to *supply* facts that have not been proved.[5] Facts supporting proof of each required element must be found in the evidence or the People's burden of proof is unmet. It is thus misleading to analogize a jury's task to solving a picture puzzle depicting an actual and familiar object unrelated to the evidence.

Here, the prosecutor began with the outline of California. She did not posit that the outline had been established by any evidence; it was simply presented as a given. The essential question, "[W]hat state is this?," began with an important factor presumed: that the outline was, indeed, the depiction of a state.[6] In these two respects, the hypothetical invited the jury to jump to a conclusion before the

---

[5] *People v. Collins* (2010) 49 Cal.4th 175, 242-256, involved a claim of juror misconduct. The court's discussion of that claim further articulates the difference between a jury that evaluates the evidence received, and one that relies on information outside the record.

[6] Due to the state of the record, we must infer from the prosecutor's argument what the graphic looked like. In doing so, we do not mean to suggest that the flaw here was simply an improper description of a permissible visual aid. Pictures not based on the actual evidence may be confusing or misleading in themselves. The impact of their misuse may be heightened *because* they are visual.

prosecutor recounted any other hypothesized "evidence." (*Katzenberger, supra*, 178 Cal.App.4th at p. 1267.) The prosecutor did go on to mention other "evidence," and urged the jury to "look at the entire picture." However, the most important part of her hypothetical, the visual aid showing the shape of California, was not supported by evidence admitted during the imaginary trial and was also irrefutable.

Additionally, the hypothetical was misleading because it failed to accurately reflect the evidence *in this case*, which was far from definitive. There may certainly be cases in which a few, particularly strong pieces of information (such as scientific evidence or the testimony of a single reliable witness) are sufficiently compelling to prove the defendant guilty beyond a reasonable doubt. (*People v. Jones* (2013) 57 Cal.4th 899, 961 [fingerprints, carpet fibers, and DNA established defendant's identity as the killer]; *People v. Young* (2005) 34 Cal.4th 1149, 1181 [testimony of a single witness can be sufficient]; *People v. Scott* (1978) 21 Cal.3d 284, 296 [same].) This was not such a case. It involved starkly conflicting evidence and required assessments of witness credibility. The crucial evaluation of Jane's testimony involved many factors, including her demeanor at trial, the inconsistencies in her various accounts, her initial denial under oath, her unwillingness to answer numerous questions, the lack of corroborating evidence, defendant's denials, and testimony from Jane's father corroborating defendant's account.

We take care to note that not all visual aids are suspect. The use of charts, diagrams, lists, and comparisons *based on the evidence* may be effectively and fairly used in argument to help the jury analyze the case. In contrast, one of the dangers with the kind of presentation made here is that it had nothing to do with the case or the evidence before the jury. It presented a simplistic hypothetical case, oddly described as a "criminal trial." It used a visual in no way analogous to

13

the facts at issue and characterized the essential question as "[W]hat state is this?" The hypothetical presented the answer to that question as a given, based not on evidence received, but on the jurors' outside knowledge of what the geographical outline of California looks like. What occurred here was not the legitimate marshalling of evidence with charts outlining the facts or relating them to the legal concepts explained in the jury instructions. Instead the prosecutor offered a theoretical analogue, unrelated to the evidence, purporting to relate the exacting process of evaluating the case to answering a simple trivia question. As noted, judges and advocates have been repeatedly admonished that tinkering with the explanation of reasonable doubt is a voyage to be embarked upon with great care.

Counsel trying to clarify the jury's task by relating it to a more common experience must not imply that the task is less rigorous than the law requires. By presenting a hypothetical whose answer involves a single empirical fact, the prosecutor risked misleading the jury by oversimplifying and trivializing the deliberative process.

There is a separate problem with the prosecutor's argument. It strongly implied that the People's burden was met if its theory was "reasonable" in light of the facts supporting it.

The prosecutor told the jury that in reaching its decision it must reject impossible and unreasonable inferences, and only consider reasonable possibilities. She stated that "your decision has to be in the middle. It has to be based on reason. It has to be a reasonable account. . . . [Y]ou need to look at the entire picture, not one piece of evidence, not one witness . . . to determine if the case has been proven beyond a reasonable doubt."

She then asked the jury to consider the following: "Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of

14

strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.* [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?" (Italics added.) She continued: "Is it reasonable to believe that there is an innocent explanation for a grown man laying on a seven year old? No, that is not reasonable. Is it reasonable to believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant *or he['s] good for it? That is what is reasonable. He's good for it*." (Italics added.)

We observe at the outset that many parts of the prosecutor's argument were unobjectionable. It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory. (See, e.g., CALCRIM Nos. 224, 226.) It is permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts. (See, e.g., CALCRIM Nos. 226, 300.) It is certainly proper to urge that the jury consider all the evidence before it. (§ 1096; CALCRIM No. 220.)

Here, the prosecutor's argument began with what the jury could consider: reasonably possible interpretations to be drawn from the evidence. While this is an acceptable explanation of the jury's starting point, it is only the beginning. Setting aside the incredible and unreasonable, the jury evaluates the evidence it deems worthy of consideration. It determines just what that evidence establishes and how much confidence it has in that determination. The standard of proof is a measure of the jury's level of confidence. It is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary

15

facts have been proven beyond a reasonable doubt. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5 ["The government must prove beyond a reasonable doubt every element of a charged offense"].) The prosecutor, however, left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden. The failure of the prosecutor's reasoning is manifest.

Section 1096, codifying the standard of proof, expressly provides that a "reasonable" doubt is not a mere " 'possible' " or " 'imaginary' " doubt. In *People v. Romero* (2008) 44 Cal.4th 386 (*Romero*), we approved the prosecutor's argument that the jury must " 'decide what is reasonable to believe versus unreasonable to believe' and to 'accept the reasonable and reject the unreasonable.' " (*Id*. at p. 416.) We concluded that "[n]othing in [that] explanation lessened the prosecution's burden of proof. The prosecution must prove the case beyond a reasonable doubt, not beyond an unreasonable doubt." (*Ibid*.)

Conversely, it is error for the prosecutor to suggest that a "reasonable" account of the evidence *satisfies the prosecutor's burden of proof*. In *State v. Sappington* (Kan. 2007) 169 P.3d 1107, the prosecutor told the jurors that they were not required to " 'know beyond any doubt' " that the defendant was guilty and explained: " 'Remember our test is beyond a reasonable doubt. *And is it reasonable given that evidence that we have that* [*the defendant*] *is the one that did this? And I suggest to you the answer is, yes, it is*.' " (*Id*. at p. 1113.) The Kansas Supreme Court concluded that the prosecutor misstated the burden of proof: "To convict a defendant of a crime, the jury must find that it has no reasonable doubt as to the truth of each claim the State must prove. [Citation.] Yet, as [defendant] argues, his prosecutor's statement suggests that a jury may convict if the jury believes that it is merely 'reasonable' that he committed the crime. We conclude that this misstatement dilutes the State's burden because a

16

jury could convict due to its reasonable belief that a defendant committed a crime while still having a reasonable doubt as to guilt." (*Id*. at p. 1115.)

It is likewise error to state that "a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340; accord, *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 (*Ellison*).) It is, and remains, the prosecutor's burden to prove the case. If the defense chooses to produce evidence, the jury must, of course, consider it as part of the complete record before it. To that end, the prosecution can surely point out that interpretations proffered by the defense are neither reasonable nor credible. Nevertheless, even if the jury rejects the defense evidence as unreasonable or unbelievable, that conclusion does not relieve or mitigate the prosecutorial burden. The prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own. In *Ellison*, for example, the prosecutor made several arguments to the effect that " 'you have to look at whether or not it's reasonable or unreasonable for the defendant to be innocent,' " and to vote not guilty if " 'it's reasonable that the defendant is innocent.' " (*Ellison*, at p. 1351.) The appellate court concluded that "the prosecutor improperly attempted to lessen the People's burden of proof by arguing to the jury that the beyond-a-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable." (*Id*. at p. 1353.)

Here, the prosecutor did not simply urge the jury to " 'accept the reasonable and reject the unreasonable' " in evaluating the evidence before it. (*Romero, supra,* 44 Cal.4th at p. 416.) Rather, she confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a "reasonable" account of the evidence. These remarks clearly diluted the People's burden.

It is reasonably likely that the prosecutor's hypothetical and accompanying argument misled the jury about the applicable standard of proof and how the jury should approach its task.

B. *Forfeiture*

Although we have found the prosecutor's argument improper, the People argue that defendant forfeited his claim of error by failing to object. As a general rule, " '[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*), quoting *People v. Thornton* (2007) 41 Cal.4th 391, 454.) The defendant's failure to object will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct. (*Hill*, *supra*, 17 Cal.4th at p. 800.)

The issue was forfeited. A prosecutor's misstatements of law are generally curable by an admonition from the court. (*People v. Bell* (1989) 49 Cal.3d 502, 548.) Such was the case in *Otero*, *supra*, 210 Cal.App.4th at page 873. Nothing in this record indicates that an objection would have been futile. Nor was the prosecutor's argument so extreme or pervasive that a prompt objection and admonition would not have cured the harm.

C. *Ineffective Assistance of Counsel*

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*Lopez, supra*, 42 Cal.4th at p. 966.) Defendant advances that claim here. He bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was

deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 (*Strickland*); *People v. Ledesma* (2006) 39 Cal.4th 641, 746; *People v. Ledesma* (1987) 43 Cal.3d 171, 216, 218.)

"Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 746, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1211.) When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was " ' "no conceivable tactical purpose" ' for counsel's act or omission. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 675.) "[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one" (*People v. Padilla* (1995) 11 Cal.4th 891, 942, overruled on another ground in *Hill, supra,* 17 Cal.4th at p. 823), and "a mere failure to object to evidence or argument seldom establishes counsel's incompetence" (*People v. Ghent* (1987) 43 Cal.3d 739, 772).

Nonetheless, deference to counsel's performance is not the same as abdication. (*People v. Ledesma, supra,* 43 Cal.3d at p. 217.) "[I]t must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*Ibid*.)

In this case, the problems with the prosecutor's argument were not difficult to discern. *Katzenberger, supra*, 178 Cal.App.4th 1260, 1269, which disapproved use of a puzzle showing the Statue of Liberty to "illustrate" the reasonable doubt standard, provided firm grounds for an objection at the time of defendant's trial. Additionally, counsel required no authority beyond section 1096 to conclude that

19

the prosecutor's argument urging the jury to convict based on a reasonable account of the evidence misstated the burden of proof.

The People offer two possible tactical reasons for counsel's omission. First, the prosecutor's hypothetical was nonresponsive to the defense argument and simply a waste of time. Second, it suggested that the prosecutor carried a *heightened* burden of proof because it presupposed strong evidence to establish its conclusion. These arguments fail. "Explaining" the reasonable doubt standard by using an iconic image unrelated to the evidence is particularly misleading to the jury and strikes at the most fundamental issue in a criminal case. The image is too powerful and pivotal to dismiss as irrelevant or trivial argument. Additionally, the argument was aimed at lessening, not heightening, the burden of proof. The prosecutor posited an easy example of proof beyond a reasonable doubt to reassure this jury that it could confidently return guilty verdicts in a case not nearly so strong as her hypothetical. The hypothetical, along with the prosecutor's argument that the jury could convict based on a "reasonable" account of the evidence, cannot conceivably be viewed as beneficial to the defense.

Additionally, because the prosecutor's hypothetical came in rebuttal, defense counsel had no opportunity to counter it with argument of his own. His only hope of correcting the misimpression was through a timely objection and admonition from the court. Under these circumstances, we can conceive of no reasonable tactical purpose for defense counsel's omission.

Defendant also bears the burden of showing prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.) The day before closing argument, the trial court correctly instructed the jury on the presumption of innocence, reasonable doubt, and the prosecutor's burden of proof. It has often been emphasized that arguments of counsel "generally carry less

20

weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (*Boyde v. California* (1990) 494 U.S. 370, 384; accord *Mendoza, supra,* 42 Cal.4th at p. 703; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, superseded by statute on another ground, as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

Based on these principles and the records before them, the *Katzenberger* and *Otero* courts found the prosecutors' use of visual aids harmless in light of the correct instructions on reasonable doubt, defense counsel's objections to the argument, the trial courts' admonitions, and the strength of the evidence. (*Otero, supra,* 210 Cal.App.4th at pp. 873-874; *Katzenberger, supra*, 178 Cal.App.4th at pp. 1268-1269.) Those saving factors are not present here.

There was no reason for the jury to reject the prosecutor's hypothetical. It did not directly contradict the trial court's instruction on proof beyond a reasonable doubt, but instead purported to illustrate that standard. The prosecutor introduced further confusion by suggesting that it was "reasonable" to believe that defendant was guilty. Because there was no timely objection, the trial court did not admonish the jury to disregard the prosecutor's argument. Thereafter the court gave additional instructions focusing on lesser included offenses and explaining the verdict forms. It repeated, in that context, that any verdict of guilt required proof beyond a reasonable doubt. It did not, however, reinstruct on that concept.

21

As a result, the prosecutor's argument was the last word on the subject. (Compare *Mendoza, supra*, 42 Cal.4th at p. 703 [prosecutor's misstatement of law was not prejudicial because "[t]he trial court admonished the jury [citation] and gave them the correct standard"]; *Ellison, supra,* 196 Cal.App.4th at p. 1353 [same]; *Otero, supra*, 210 Cal.App.4th at p. 873 [same]; *Katzenberger, supra*, 178 Cal.App.4th at pp. 1268-1269 [same].)

As the People concede, this was a very close case. The prosecution depended almost entirely on Jane Doe's credibility, which was called into question in several respects. Jane did not voluntarily report the alleged touching. It came to light through an anonymous informant of unknown motive or veracity. Jane's initial statement to police was not introduced into evidence. In her forensic interview, although she claimed that defendant had lain on top of her four times, she provided very few corroborating details. At trial, she repeatedly and emphatically claimed no touching had occurred. After a series of leading questions from the prosecutor, she changed her testimony and affirmed that defendant had lain on top of her, but only twice. She refused to answer many of the prosecutor's questions and admitted that she found them confusing. She answered *none* of defense counsel's questions about the alleged touching on cross-examination.[7] The trial court observed that "this was an extraordinarily difficult examination of this witness, both with respect to direct and cross-examination." Initially, Jane's father told deputies that he had seen defendant lying on top of

---

[7]     Indeed, counsel could well have argued that Jane's testimony should have been stricken for lack of an opportunity for meaningful cross-examination. (*People v. Price* (1991) 1 Cal.4th 324, 421; *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735-736; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 240, pp. 349-350.) It appears that, as a tactical decision, defense counsel thought it better to use Jane's inconsistencies and refusals to undermine her credibility in hopes of an acquittal.

22

Jane. At trial, however, he recanted his statement in material respects, testifying that defendant and the two children were reaching for a toy and that he was unalarmed by the conduct. Defendant also took the stand and denied that any inappropriate touching had occurred.

It was up to the jury to evaluate the various versions of events and to weigh witness credibility in making its decision. Given the closeness of the case and the lack of any corrective action, there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt. Accordingly, defendant's convictions cannot stand.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed.


**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**ALDRICH, J.***

_____

\* Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Centeno
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 214 Cal.App.4th 843
**Rehearing Granted**

_____

**Opinion No.** S209957
**Date Filed:** December 4, 2014
_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Cara D. Hutson

_____

**Counsel:**

Jean Ballantine, under appointment by the Supreme Court for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jean Ballantine
12405 Venice Boulevard, #139
Los Angeles, CA  90066
(310) 398-5462

Vincent P. LaPietra
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2292