Filed 10/22/25  P. v. Tukes CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KABARI TUKES,<br><br>        Defendant and Appellant. | A170341<br><br>(San Francisco County<br>Super. Ct. No. SCN234668) |

Kabari Tukes was charged by information with four counts:  Felon in possession of a firearm (Pen. Code,[1] § 29800, subd. (a)(1)), carrying a loaded firearm (§ 25850, subd. (a)), carrying a concealed firearm (§ 25400, subd. (a)(2)), and misdemeanor exhibiting a concealable firearm in public (§ 417, subd. (a)(2)(A)).  The jury found Tukes guilty of felon in possession of a firearm.  The jury found Tukes not guilty of exhibiting a firearm and it was deadlocked as to the remaining two counts—carrying a concealed firearm and carrying a loaded firearm.

On appeal, Tukes argues that the prosecutor's remarks during closing argument when discussing the knowledge element for felon in possession of a firearm amount to prosecutorial misconduct.  Tukes also argues his counsel

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

1

was constitutionally ineffective for failing to object to the prosecutor's remarks.  We affirm.

## BACKGROUND

On November 4, 2021, Tukes drove into the drive-thru lane at a McDonald's and ordered a hamburger.  Tukes became upset with the preparation of his hamburger and started getting aggressive towards the store employees who were attempting to help resolve his complaint.  According to T.R., the store's general manager, she was just returning from another store when the manager asked her for assistance in dealing with Tukes.  The manager explained that they had already changed the hamburger three times, but Tukes was still upset.  T.R. approached the drive-thru window and saw Tukes standing in front of the drive-thru window, outside of his car because his car door window was not working.

T.R. offered to replace the hamburger again, but Tukes refused and wanted his money back.  T.R. got the money for the refund and returned to the drive-thru window.  From there, she saw Tukes on the passenger side of his car moving some clothes, as if he was looking for something.  He then pulled out a small black gun from among the clothes.  Tukes walked around his car towards the drive-thru window, pulled back the top portion of the gun, put it in his pants and covered it with his shirt.  T.R. handed Tukes his money and Tukes walked back towards his vehicle then stopped and started walking back towards the drive-thru window.  T.R. yelled at her employees that Tukes had a gun and instructed them to hide and call 911.  Tukes left the drive-thru and later returned on foot.

The store had surveillance cameras that recorded the interaction at the drive-thru window, which was played for the jury.

Police officers arrived at the store and spoke to Tukes for approximately one hour before they ultimately arrested him. Police officers located Tukes's car about a block away from the store, with another person in the driver's seat. The officers searched the car and found a backpack on the passenger seat containing a black handgun as well as several pieces of mail and other documents with Tukes's name on them.

A DNA forensic analyst also testified that DNA matching Tukes's was found on the firearm.

Tukes was charged by information with four counts: Felon in possession of a firearm (count I, § 29800, subd. (a)(1)); convicted person carrying a loaded firearm (count II, § 25850, subd. (a)); concealed firearm on a convicted person (count III, § 25400, subd. (a)(2)); and misdemeanor exhibiting a concealable firearm in public (count IV, § 417, subd. (a)(2)(A)).

After a jury trial, Tukes was convicted of count I, acquitted of count IV, and the jury deadlocked on counts II and III. The trial court declared a mistrial as to counts II and III, and they were subsequently dismissed. Tukes was sentenced to 2 years in prison, execution suspended, with eight months in jail and formal probation.

## DISCUSSION

Tukes argues the prosecutor committed misconduct during his closing argument by misinstructing the jury on the required mental state for felon in possession of a firearm and lowered the state's burden of proof. Tukes further argues that his defense counsel was ineffective for failing to object at the trial court, rendering the prosecutor's error reviewable on appeal despite the lack of objection. Alternatively, Tukes argues that even if counsel was not ineffective, we may still exercise our discretion to review the prosecutor's misconduct because it prejudicially affected Tukes's substantial rights.

## 1. Prosecutorial Misconduct

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument.  [Citation.]  However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)  "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Id*. at p. 667.)

### a. Prosecutor's Closing Argument

The crime of possession of a firearm by a felon has three elements—(1) the defendant possessed a firearm, (2) the defendant knew that he possessed the firearm, and (3) the defendant had previously been convicted of a felony. (*People v. Clark* (2021) 62 Cal.App.5th 939, 958.)  "Implicit in the crime of possession of a firearm is that a person is aware . . . that the item is in his or her possession . . . ." (*People v. Kim* (2011) 193 Cal.App.4th 836, 846.)  Thus, it is clear that actual knowledge of possession of a firearm is necessary before a defendant may be convicted of the crime of possession of a firearm by a felon, and the jury in this case was instructed as such by the trial court.

In the prosecutor's closing argument, he went over the elements of each count to "distill the essence" of the counts.  In discussing the elements of count I, possession of a firearm by a felon, the prosecutor noted that there were two instances of possession—possession based on the backpack found in

4

Tukes's car and possession based on when he grabbed the firearm, held it in his hand, and tucked it away in his pants under his shirt at the drive-thru window. After discussing the elements of counts II and III, the prosecutor noted that all three counts contained a knowledge element. In attempting to explain the knowledge element, the prosecutor stated, "When we're talking about intent—in the jury instructions it talks [about] what does intent require. Knowledge. Knew or should have known. That's the specific mental intent that we are referring to in the instructions."

The prosecutor then linked the evidence presented during trial with the elements of count one. "Going back to Count 1, we know that Mr. Tukes possessed the firearm. We've seen it in his vehicle. We've seen his DNA on it. We've seen the backpack. We've seen the items inside of his backpack that are his. The vehicle he is seen [i]n on a video tape . . . at McDonald's. The vehicle is around the corner, same vehicle registered to him about one block away. We know he removed that firearm from the vehicle, put it in his waistband. He possessed a firearm. He knew he possessed a firearm. It's his car. It's on the floorboard of his passenger seat. He was just in that vehicle moments before. This is evidence of knowledge. He also grabs the firearm and he racks it and he puts it in his waistband. He knows it's there. He's previously been convicted of a felony."

### b. *Forfeiture*

The prosecutor's definition of the knowledge element clearly misstated the law and expanded the knowledge element to include not only actual knowledge of possession, but also constructive knowledge. Such expansion of the knowledge element lowers the prosecution's obligation to overcome reasonable doubt on all elements of the crime.

The Attorney General, however, argues that Tukes forfeited his challenge to the alleged misconduct. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) Tukes did not object to the prosecutor's misstatement of law. While failure to object would not forfeit his claim when doing so would have been futile or an admonition would be insufficient to cure the purported harm, Tukes does not argue that a timely objection would have been futile or insufficient. (*Centeno*, *supra*, 60 Cal.4th at p. 674.) Thus, Tukes has forfeited this challenge on appeal.

## 2. Ineffective Assistance of Counsel

Next, Tukes argues that his counsel rendered ineffective assistance by failing to object to the prosecutor's erroneous statement of law. " 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' [Citation.] . . . [Tukes] bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*Centeno*, *supra*, 60 Cal.4th at p. 674, citing *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.)

"On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory

explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.) " '[T]he decision . . . whether to object to comments made by the prosecutor in closing argument is a highly tactical one' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*Centeno*, *supra*, 60 Cal.4th at p. 675.)

Assuming, arguendo, defense counsel's failure to object constitutes deficient performance, Tukes cannot show absent counsel's failure to object there is a reasonable probability of a more favorable outcome. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 687–688, 693–694.) Viewing the prosecutor's argument as a whole, and in light of the trial court's jury instructions, there is no reasonable likelihood the jury understood or applied the complained of comments in an improper or erroneous manner.

In *Centeno*, the prosecutor told the jury, "it must reject impossible and unreasonable inferences, and only consider reasonable possibilities," "strongly imply[ing] that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Centeno*, *supra*, 60 Cal.4th at pp. 671–672.) The *Centeno* court held that the prosecutor "confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." (*Id*. at p. 673.)

Moreover, the *Centeno* court found the prosecutor's statements did not "directly contradict the trial court's instructions on proof beyond a reasonable doubt, but instead purported to illustrate that standard." (*Centeno*, *supra*,

7

60 Cal.4th at p. 676.) Even though the trial court gave additional instructions after the prosecutor's statements, it did not reinstruct on the proof beyond a reasonable doubt standard, leaving the prosecutor's argument as the "last word on the subject." (*Id*. at pp. 676–677.) The court reversed the defendant's convictions based on the closeness of the case, which depended almost entirely on the credibility of one witness, and the lack of corrective action that resulted in a "reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*Id*. at p. 677.)

Here, the prosecutor did misstate the law when he stated the knowledge element as "knew or should have known." This error, however, did not dilute the state's burden of proof because it was an isolated incident. Unlike the prosecutor in *Centeno*, the prosecutor here did not repeatedly suggest or repeat the improper standard. The prosecutor never repeated the erroneous standard again and did not argue that Tukes "should have known" he possessed the firearm. Instead, the prosecutor emphasized that evidence of knowledge was required to convict Tukes. Later in the prosecutor's closing argument, after the misstatement of law, he stated: "[Tukes] *knew* he possessed a firearm. It's his car. It's on the floorboard of his passenger seat. He was just in that vehicle moments before. *This is evidence of knowledge.* He also grabs the firearm and he racks it and he puts it in his waistband. *He knows* it's there." (Italics added.)

Further, the parties do not dispute that the trial court properly instructed the jury on the elements of count I and that if the attorney's comments on the law conflict with the court's instructions, the jury must follow the court's instructions. Instead, Tukes argues that the prosecutor's comments, which came after the jury instructions, were not clearly at odds

with the jury instructions and purported to clarify and further define those instructions. However, unlike *Centeno*, the prosecutor's misstatement of law was not the final say on the issue. As illustrated above, the prosecutor applied the correct standard of law when discussing the evidence presented. Thus, in the context of the whole closing argument and the jury instructions, the impact of the prosecutor's misstatement was minimal where the misstatement was not repeated and the prosecutor used the correct standard of law while connecting the evidence to the elements of count I later in his closing argument.

Tukes goes on to argue that "the challenged statement affected the jury's deliberation on a critical and controverted issue in a closely balanced case" because "the jury's verdict suggests that Tukes's knowledge of the gun's presence was a pivotal issue." We disagree. As noted above, the misstatement's impact on the jury, if any, was minimal. And unlike *Centeno*, Tukes's conviction on count I did not depend almost entirely on the credibility of one witness.

Here, the firearm was found in the vehicle Tukes was driving when he was in the drive-thru, within a backpack full of Tukes's possessions, and the firearm had Tukes's DNA on it. Tukes fails to show that his knowledge that he possessed the firearm, based on the evidence presented to the jury, was a pivotal issue such that the prosecutor's misstatement regarding the knowledge element would have affected the jury's deliberations.

Based on the foregoing, Tukes has failed to show a reasonable probability of a more favorable outcome.

## DISPOSITION

The judgment is affirmed.

9

CLAY, J.*

WE CONCUR:

STREETER, Acting P. J.
GOLDMAN, J.

---

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10