Filed 7/29/15  P. v. Burciaga CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SALVADOR HILARIO BURCIAGA, JR.,<br><br>    Defendant and Appellant. | G049684<br><br>(Super. Ct. No. 08HF1486)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Dennis P. O'Connell for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew S. Mestman and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

\*            \*            \*

Defendant Salvador Hilario Burciaga, Jr., raises two issues on appeal. He contends the prosecutor committed misconduct, violating his constitutional rights when the prosecutor commented in closing argument on defendant's failure to produce an expert witness to testify in connection with DNA evidence introduced by the prosecution. Next he argues the trial court erred in (1) rejecting the jury's true finding on a firearm enhancement verdict form containing typographical errors, and (2) in having the jury reconvene to deliberate on a properly typed verdict form. Even were we to assume the prosecutor committed misconduct, we find any such error was harmless in light of the fact the court ordered the prosecutor's comment stricken and directed the jury to disregard the comment. Neither did the court err in rejecting the jury's finding on the erroneous verdict form.

I

FACTS

Defendant, Nestor Lopez, Cesar Aziel Pedroza, and Oscar Ramos were charged in a first amended information with the premeditated and deliberate attempted murder of "Jane Doe" (Pen. Code,[1] §§ 664, subd. (a), 187, subd. (a); count one), active participation in a criminal street gang (§ 186.22, subd. (a); count two), and conspiracy to commit murder (§§ 182, subd. (a), 187, subd. (a); count three). A gang enhancement (§ 186.22, subd. (b)(1)) was alleged in connection with the murder and conspiracy charges. As to defendant, the information also alleged he inflicted great bodily injury (§ 12022.7, subd. (a)) in connection with the attempted murder, and personally and intentionally discharged of a firearm causing great bodily injury to "Jane Doe." (§ 12022.53, subd. (d).) The codefendants were also charged with discharging a firearm resulting in great bodily injury or death. (§ 12022.53, subd. (b), (e)(1).) Defendant was tried alone. His codefendants are not parties to this appeal.

_____

[1] All undesignated statutory references are to the Penal Code.

2

*Prosecution Evidence*

About 6:00 p.m. on July 28, 2008, a group of friends had just finished playing basketball on Shalimar Dr. in Costa Mesa, when Luis N. saw someone running toward them. The person was wearing baggy jeans, a dark hat, had a dark bandana over his face, and was carrying a sawed off shotgun. Luis described the person as being approximately 5 feet 8 or 9 inches tall and weighing about 110 pounds. Luis then heard him say, "Where are you from?"

A friend of Luis's, who had been in the bed of Luis's truck with Luis, ran. Then Luis heard a gunshot "around the side" of his truck. A girl standing by the side of the truck, Angelique P., was shot. After the shot was fired, the suspect then ran toward a white car. The shooter's hat fell off. The driver of the white car, a male Hispanic approximately 20 to 24 years old, called out to the shooter to hurry up. The shooter got into the car which then sped away. When the police arrived, Luis pointed out to an officer the hat the shooter dropped.

The friend who had been in the bed of Luis's truck, Erik A., said the shooter was about 19 or 20 years old, 5 feet 9 or 10 inches tall, skinny, about 150 to 160 pounds, and had on a blue sweater, jeans, a bandana covering most of his face, sunglasses, and a hat.

Stephanie A. saw the shooting. She said she saw what she thought was a white Toyota Camry car pull up "very loudly" and saw the front passenger get out, "extremely covered," and run toward the driveway. Pointing at Angelique P., he yelled, "Where are you from?" He shot Angelique and ran back to the car, dropping his hat. The car "quickly" left. The driver and his two passengers were young male Hispanics. Stephanie estimated the shooter was about 17 or 18 years old, five foot seven inches tall, weighed about 140 to 145 pounds, had on a white shirt, a brown hoodie, a dark blue

bandana over his face, a dark hat, and dark jeans. Only his eyes were visible. Stephanie called 911.

Officer Christopher Bates of the Costa Mesa Police Department responded to the scene of the shooting after 6:00 p.m., but well before 6:30 p.m. When he arrived at the location, he saw Angelique lying in a driveway and a younger male holding a towel over her upper torso. The towel was "covered in blood." She appeared to have sustained a shotgun wound. Bates saw a hat in the street about three feet from the curb where he found Angelique. "World's Greatest Grandpa" was on the hat. The hat was retrieved by a crime scene investigator. Luis and Stephanie identified the hat as the one dropped by the shooter.

As a result of the shooting, Angelique suffered a punctured right lung and had to have surgery on her stomach. She remained in the hospital for two months.

Officer Keith Davis was the supervisor of the Costa Mesa Police Department's gang unit in July 2008. He said the "World's Greatest Grandpa" hat looked new, so he went to local retail shops to see if he could find a similar hat. The day after the shooting, he and another officer went to a Kmart located 2.5 miles from the location of the shooting. He found a similar hat in the sporting goods department. Because that hat was the only one of its kind in the store, the other officer purchased it. The officers left because they could not find the loss prevention officer for the store.

They contacted the loss prevention officer from Kmart the next day. Using the bar code and 12-digit number on the hat the officer bought the day before, the prevention officer was able to confirm a matching hat—the same size and color, "everything identical"—had been purchased from Kmart at 5:03 p.m. on the date of the shooting. A T-shirt and sunglasses had been purchased at the same time. An employee discount was used to buy the items. A videotape of the purchase was retrieved. Four individuals were together at the cash register when the purchase was made. Officer

4

Davis identified defendant as one of the four. Also present were Pedroza, Ramos, and Lopez. Pedroza paid using his employee discount card.

A buccal swab was eventually taken from defendant. A forensic scientist, using a single swab, swabbed DNA from the inside band and the top of the visor of the hat dropped by the shooter. On cross-examination he stated DNA can be transferred to an item by one simply touching it or by an undetectable amount of saliva landing on it when one talks near the object, and that one may pick up an object and not leave behind any DNA on the object. He also stated some people leave more DNA behind than others.

Another scientist withdrew the DNA from the buccal swab obtained from defendant and performed the DNA amplification (duplication) from the "World's Greatest Grandpa" hat. Yet another scientist with the Orange County crime lab prepared the DNA profiles of defendant, Lopez, Ramos, and Pedroza. At least two individuals contributed DNA found on the hat. Lopez, Ramos, and Pedroza were not contributors to the DNA found on the hat. The DNA of the major contributor was calculated to be expected to be found in one in one-trillion people. There was no difference between defendant's DNA and the DNA of the major contributor of the DNA found on the hat.

On August 6, 2008, Officer Bang Le of the Costa Mesa Police Department made a traffic stop of a vehicle driven by defendant. Pedroza was in the vehicle with defendant. Knives were found on defendant, Pedroza, and in the glove compartment. An Altoid tin in defendant's pocket had the letters VLTR and the number 13 scratched into the lid of the tin.

Investigator David Sevilla of the Costa Mesa Police Department, testified he was familiar with the criminal street gang Varrio Little Town (VLT) and that defendant was an active participant in the gang on January 28, 2008. In response to a hypothetical question tracking the facts of this case, he opined the shooting was "done to promote . . . or assist" VLT.

5

*Defense Evidence*

Two weeks before the shooting, a police officer contacted defendant and determined that defendant was six feet tall and weighed 170 pounds. Another police officer conducted a traffic stop of defendant on April 23, 2008. The officer determined that defendant was five feet 11 inches tall and weighed 200 pounds.

A witness to the shooting described the shooter as standing about five feet four or five inches tall and weighing about 130 pounds, but noting that based on the baggy clothing, he could have been "bigger" or smaller. Another witness described the shooter as being "neither short nor tall," about five feet five or six inches tall, and wearing dark pants and a white T-shirt with short sleeves. A third witness, who said he saw the shooter from approximately 100 feet away, stated the shooter was about five feet nine inches tall.

*The Verdicts and Sentencing*

The verdict form on the attempted murder charge also included blank spaces for the jury to fill in with either "True" or "Not True" on whether defendant deliberated and premeditated the attempted murder, whether the attempted murder was committed for the benefit of a criminal street gang, and whether defendant personally inflicted great bodily injury. Although defendant was alleged to have personally and intentionally discharged a firearm, causing great bodily injury or death, the verdict form for the attempted murder charge and attached enhancements mistakenly asked the jury to determine whether defendant *vicariously* discharged a firearm. That verdict form contained an additional error: it named the victim of the attempted murder as Gustavo A[.], not "Jane Doe," as alleged in the information.

6

The jury reached its verdicts on all three counts. After the clerk read the verdict and true findings on each of the enhancements in the verdict form for attempted murder, but before the verdicts were read on the remaining charges, the court noticed the errors and requested the verdict form. The court gave the jury a new verdict form for the attempted murder with attached enhancements and requested the jury to reconvene using the new verdict form. The corrected form did not name a victim and stated the jury to find true or not true whether defendant personally and intentionally discharged a firearm causing great bodily injury or death. Ultimately, the jury found defendant guilty on all counts and found true each enhancement alleged in connection with the attempted murder.

The court imposed a life sentence on the attempted murder and set the minimum eligibility for parole at 15 years. (§ 186.22, subd. (b)(5).) The court then imposed a consecutive 25 years to life term on the firearm discharge allegation. The sentences imposed on the remaining charges and enhancements were stayed pursuant to section 654.

II

DISCUSSION

A. *Comment on the Failure to Present a Witness*

Defense counsel argued to the jury that law enforcement erred in the manner it collected DNA evidence from the hat and there were "testing deficiencies" in the manner the DNA was analyzed. In fact, defense counsel labeled the collection "a collection catastrophe."[2] During rebuttal, the prosecutor made the following statements: "And the DNA, the DNA being a collection catastrophe. The DNA being lacking in

---

[2] The reference appears to have been made in connection with the fact that a single swab was used on the inside and the outside of the hat, meaning there is no way of telling whether the DNA obtained from the hat was on the outside of the hat or the inside.

7

some way. Just so you know, he has that right to call any witness he wants to call. Just as I put up witnesses and he put up his own witnesses to decide what was seen, he has a right to use a subpoena power to call witnesses. If he wanted to call a DNA expert to look over the evidence, and testify, he has that right to do that. If he doesn't like the way the cap is swabbed, he can request the cap to be swabbed. He can request the cap to be tested. [¶] So, if he has any problems, he has those accesses. He can do those things to test the evidence. Because it's not a one-way street."

Defense counsel immediately asked to approach the bench and made a motion for a mistrial, claiming it is improper for a prosecutor to use a defendant's right as a prosecutorial weapon. He analogized it to commenting on a defendant's right to remain silent. (See *Griffin v. California* (1965) 380 U.S. 609 [a prosecutor's commenting on the defendant's failure to testify violates the Fifth Amendment].) The court, told defense counsel that "failure to call logical witnesses is fair grounds," and the prosecutor's statements were not analogous to commenting on a defendant's failure to testify. Still, the court concluded the issue was "very delicate." The court denied the motion for a mistrial and found the comments did not constitute misconduct.

Defense counsel informed the court he had retained an expert and, apparently based on information obtained from the expert, was able to get "all of the evidence I wanted to get out of [the prosecution's] experts, this is now being used against me because I haven't called somebody." The court admonished the jury as follows: "Ladies and Gentlemen, the prosecutor's comments about the defense not having an expert witness, are stricken. The jury will disregard that. That's not a valid argument."

Under the federal Constitution, a prosecutor's misconduct requires reversal when "it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.) Under California law, a prosecutor's misconduct requires reversal when "it involves 'the use of deceptive

8

or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*Ibid.*)

Defendant's analogy to *Griffin v. California*, *supra*, 380 U.S. 609, is inapt. The constitutional flaw in permitting a prosecutor to comment on a defendant's silence is that it punishes the defendant for exercising a constitutional privilege. (*Id.* at p. 614.) The prosecutor's comment in the present case did not impose a penalty for exercising a constitutional privilege. The prosecutor's comment was directed to the purported failure of defendant to do that which he had a right to do. (U.S. Const. 6th Amend. [right of compulsory process]; § 1326, subd. (c) [defense right to issuance of subpoena]; see *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1255 ["'defendant has statutory and constitutional right to ancillary services reasonably necessary to prepare a defense'"].)

In any event, we need not decide whether the complained of argument qualifies as misconduct because under either reversible error standard, the conduct was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The prosecutor's comment was very brief, defense counsel immediately objected and the court admonished the jury to disregard the prosecutor's statements because they did not constitute "a valid argument." The court also instructed the jury that neither side is required to call all witnesses who may have relevant information. (See *People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375 [timely admonition "generally cures any harm"].) We normally presume the jury followed the court's admonition. (*People v. Centeno* (2014) 60 Cal.4th 659, 676.) There is nothing in the record to undermine that presumption in this case.

B. *The Court did not err in Rejecting a Verdict on the Wrong Verdict Form.*

Section 12022.53 provides firearm enhancements in varying situations wherein a firearm is used in the commission of certain felonies (§ 12022.53, subds. (b)-

(e)(1)), including attempted murder (§ 12022.53, subds. (a)(1), (18)). In conjunction with the attempted murder charged in count one of the amended information, defendant was charged with having personally discharged a firearm, resulting in great bodily injury. (§ 12022.53, subd. (d).) "[A]ny person who, in the commission of a felony specified in subdivision (a), . . . personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).)

The jury was instructed on the elements of section 12022.53, subdivision (d). (CALCRIM No. 3149.) Although the prosecutor had requested the jury be instructed on liability for vicariously discharging a firearm, the court denied the request. Thus, the jury was not instructed on any firearm enhancement other than subdivision (d) of section 12022.53.

The verdict form for the attempted murder charged in count one also contained separate paragraphs pertaining to the deliberation and premeditation allegation (see § 664, subd. (a)), the gang enhancement (§ 186.22, subd. (b)(1)), and the great bodily injury enhancement (§ 12022.7, subd. (a)). Apparently, the verdict form also erroneously asked the jury to determine whether defendant *vicariously* discharged a firearm.[3] There

---

[3] The initial verdict form submitted to the jury is not in the record on appeal.

Although subdivision (d) of section 12022.53 requires a defendant to have "personally and intentionally" discharged a firearm in the course of an enumerated felony and proximately causing great bodily injury or death, subdivision (e)(1) makes the enhancement applicable to one who violated section 186.22, subdivision (b) when a principal committed an act in subdivision (b), (c), or (d) of section 12022.53. Section 12022.53, subdivision (e)(1) imposes "vicarious liability" on a defendant for a principal's use of a firearm causing great bodily injury to death. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1170.)

10

were two mistakes in the verdict form. First, it stated the attempted murder victim was Gustavo A. The information named the victim as "Jane Doe." Second, defendant was not charged with vicariously discharging a firearm, and the court did not instruct the jury on vicarious liability under section 12022.53, subdivision (e)(1).

Immediately after the clerk read the verdict on count one and the findings on the enhancements related to that count, but before the verdicts on count two and three were read, the court caught the error an requested to see the verdict form on count one. According to the judge, he and the attorneys missed the errors in the verdict form before submitting it to the jury.

Over defense counsel's objection, the court crossed out the foreperson's signature on the verdict form for count one, and informed the jury: "You probably are a little puzzled what we've been doing. There was a typo, at least I think it was a typo, on the second page of the form. So, I have corrected it just in handwriting to show the allegation should have read that the defendant . . . personally discharged a firearm. Somehow the word 'vicariously' got in there, which isn't correct. [¶] So, I have crossed out the form and signature—the foreman's signature. And then I'm going to send you back and see if you're comfortable or not. You're not bound by anything at this point, we have not accepted this finding, whether or not it was personal discharge. The term 'vicarious' is used in different other cases and I'm thinking the word processor picked that up from some other case and put it in there. That's all I can think. [¶] But it's your decision, of course. So I will return the form and ask the jury to reconvene. And we will keep the other verdict forms. Please return to the jury room and take another look at it."

Approximately five minutes later, the jury alerted the court that it had a verdict. The jury again found defendant guilty of a deliberate and premeditated attempted murder as charged in count one of the amended information and found true the

11

gang enhancement, the great bodily injury enhancement, and the charged personal discharge of firearm enhancement.

Defendant argues the court prejudicially erred in returning the verdict form on count one to the jury, and that the court should have accepted the jury's signed original verdict form, which found that defendant was vicariously liable for another principal intentionally discharging a firearm and causing great bodily injury or death. In support of his argument, defendant relies on the decision in *Bigelow v. Superior Court* (1989) 208 Cal.App.3d 1127. There, the defendant was charged with a special circumstances murder in addition to other charges. The jury found defendant not guilty of the murder, but found the murder was committed while defendant or an accomplice was engaged in a robbery and a kidnapping. (*Id.*, at p. 1129; see § 190.2 [special circumstances].) Because the verdicts were received late in the afternoon, the court recessed to the next day and informed the jury they were not excused and the case was not over. (*Id.*, at pp. 1130-1131.) During the day and a half that the court and counsel attempted to resolve the issue presented by the jury's verdict and findings, one of the jurors changed his or her mind, resulting in an 11 to one deadlock on the murder count, and the court declared a mistrial as to that count. (*Id*. at p. 1129.)

The appellate court in *Bigelow* stated the issue involved inconsistent verdicts by the jury. (*Bigelow v. Superior Court*, *supra*, 208 Cal.App.3d at p. 1130.) If one is not guilty of committing a murder, a fortiori, he did not commit the murder under special circumstances. That being said, the law generally permits a jury to render inconsistent verdicts. (*People v. Avila* (2006) 38 Cal.4th 491, 600.) The trial court in *Bigelow* erred because "once the jury submits a verdict *of acquittal* to the trial court, the court may not order reconsideration of that verdict but rather must order that judgment be entered on the verdict. [Citations.]" (*Bigelow v. Superior Court*, *supra*, 208 Cal.App.3d at p. 1134, italics added; § 1161.)

12

Although a trial court is under an obligation to accept an acquittal and cannot direct the jury to reconsider that verdict, a court may direct a court to reconsider a guilty verdict or true finding. "When there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict, and if, after the reconsideration, they return the same verdict, it must be entered; but when there is a verdict of acquittal, the Court cannot require the jury to reconsider it." (§ 1161.) This also applies to true findings on enhancements. (*People v. Guerra* (2009) 176 Cal.App.4th 933, 944.)

In the present matter, the trial court did not reject an acquittal or a not true finding. Because the jury was never given a verdict form containing the charged firearm enhancement, the true finding on the verdict form containing different firearm enhancement—especially one the jury had not been instructed on—cannot be considered an implied acquittal of the charged enhancement. Neither did the trial court's action prejudice defendant. After all, the jury's true finding on the vicarious discharge enhancement, which defense counsel asserts "was properly signed by the foreman," carries a 25 years to life enhancement, the same penalty authorized by the charged personal discharge enhancement. (§ 12022.53, subds. (d), (e)(1).)

Because the jury was supplied a verdict form containing typographical errors, it was not provided a verdict form containing the charged firearm enhancement, it was never instructed on vicarious discharge and its requirements, and the prosecutor never argued defendant was liable for vicariously discharging the firearm, the conclusion is unavoidable that the jury's true finding on the vicarious discharge enhancement was not an implied acquittal of the charged enhancement. The court therefore did not err in providing the jury with a verdict form containing the charged enhancement and directing it to reconsider its verdict/true finding.

13

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.