Filed 2/9/16  P. v. Olivarez-Duran CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069082 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1309591) |
| JUAN MANUEL OLIVAREZ-DURAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Michael B. Donner, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

In December 2013 the District Attorney of Riverside County filed an information charging Juan Manuel Olivarez-Duran with committing four sexual offenses against his

granddaughter, Jane Doe (Jane):  (1) sexual intercourse with a child 10 years old or younger (count 1:  Pen. Code,[1] § 288.7, subd. (a));  (2) sodomy with a child 10 years old or younger (count 2:  § 288.7, subd. (a));  (3) committing a lewd or lascivious act upon a child under the age of 14 years (count 3:  § 288, subd. (a));  and (4) sexual intercourse or sodomy with a child 10 years old or younger (count 4:  § 288.7, subd. (a)).

A jury found Olivarez-Duran guilty of count 3 (lewd or lascivious act upon Jane), but found him not guilty of the three remaining counts.  The court sentenced Olivarez-Duran to a six-year term in state prison.

On appeal, Olivarez-Duran contends his count 3 conviction must be reversed because the court (1) committed structural error during voir dire when it "trivialized" the reasonable doubt standard by eliciting the prospective jurors' agreement that the liquid in the court's cup was "probably not bourbon," and (2) erroneously denied the defense request to declare a mistrial or retract the illustration and immediately issue the reasonable doubt instruction set forth in CALCRIM No. 220.  We affirm the judgment.

FACTUAL BACKGROUND

Olivarez-Duran is Jane's grandfather.  They lived together in a Riverside home along with Jane's father and her aunt, uncles, cousins, and grandmother, who was Olivarez-Duran's wife.  Jane's mother lived nearby and shared custody of Jane with Jane's father.  By May 2013 Jane's mother had moved to San Diego and Jane was living with her father full time.  Jane usually shared a bedroom with her father, but she would sleep

---

[1]     All further statutory references are to the Penal Code.

in the room Olivarez-Duran shared with Jane's grandmother when Jane's father went to work late at night.

On June 19, 2013, Jane's mother went to Riverside to visit Jane, who was then about six and a half years old. When Jane's mother woke up from a nap, she saw Jane sitting on the floor using her (the mother's) cell phone. When her mother asked her what she was doing, Jane said she was playing games on the phone. As Jane usually played games on the cell phone, her mother thought nothing of it and went about her day. Jane's mother testified that she noticed the next day that the app store history on her cell phone showed someone had searched for "stuff pertaining to boys kissing girls, boys touching girls, [and] boys and girls having sex" on her cell phone. The next day, Jane's parents sat down with her and asked her about the searches. Jane admitted she had entered the search terms, and she indicated she had learned them from a friend at school. When her parents asked her for the friend's name, Jane said she could not remember and started to cry.

Two days later, on June 21, 2013, Jane's mother, who was still worried about the searches she had found on her phone, spoke with Jane alone. She reassured Jane she was not in trouble and she could tell her anything. She then asked Jane whether anyone had touched her, and Jane replied that Olivarez-Duran had. Jane's mother testified that Jane told her that Olivarez-Duran had put his hands in her pants and he had "use[d] the part he goes to the bathroom with [to] try to put it inside of her." Jane also told her mother that the last time it had happened was the night before and that it happened in her grandparents' bedroom after her grandmother left for work. Jane's mother testified she

3

then took Jane to a hospital in Riverside to be evaluated by a doctor. Jane's mother spoke with the doctor about Jane's medical history and told the doctor that Jane had previously complained that she felt pain when she urinated and that her private parts itched.

On June 25, 2013, Jane was interviewed by a forensic interviewer.[2] Jane reported that Olivarez-Duran had started molesting her when she was five and a half years old and that the molestation continued for a year. She told the interviewer that on several occasions while she was asleep in her grandmother's room after her grandmother and father had left for work, Olivarez-Duran would go into the room, pull off her pants, and "[do] a bad thing" to her by "st[icking] his private into [hers]." Jane also reported that Olivarez-Duran sometimes would put his penis in her "front private," but that most times he would put his penis in her "back private." When the interviewer asked Jane to describe the molestations, Jane responded that Olivarez-Duran would move his penis in circular motions and then move it up and down. Jane said it did not hurt when he did this to her. She also said his "front private" felt "slimy" and sometimes he would use his hands to touch her "front private" and "back private." Jane said that when Olivarez-Duran was done, he would go to the bathroom to wash up or go back to sleep, and she would quietly leave the room. Jane also stated that, on one occasion, Olivarez-Duran took her hand and made her touch his "private." Jane also reported that Olivarez-Duran last molested her the morning she told her mother about the abuse and the night before.

---

2    In their appellate briefs, both Olivarez-Duran and the Attorney General assert that Jane was interviewed by a Riverside County Assessment Team (RCAT) interviewer.

DISCUSSION

Olivarez-Duran contends his count 3 conviction must be reversed because (1) the court committed structural error during voir dire, thereby rendering his conviction reversible per se, when it "trivialized" the reasonable doubt standard of proof by eliciting the prospective jurors' agreement that the liquid in the court's blue cup was "probably not bourbon," and (2) the court erroneously denied the defense request to declare a mistrial or retract the illustration and immediately issue the reasonable doubt instruction set forth in CALCRIM No. 220. These contentions are unavailing.

A. *Background*

During voir dire, the court explained to the panel of prospective jurors that every criminal defendant is presumed to be innocent until proven guilty and that a defendant is innocent until proven guilty beyond a reasonable doubt. The court explained that, despite what the prospective jurors may have heard, the standard was not proof beyond "all doubt" or a "shadow of a doubt." To illustrate the concept of reasonable doubt, the court stated:

> "I have here in my hand—in the morning I have a different container carrying a beverage, but in the afternoon I always have this blue cup.[3] Anybody want to guess what's inside of it?"

One prospective juror said water, another said tea, and another said soda. When a fourth prospective juror said "bourbon," the following exchange occurred:

---

3    Later, in describing the court's blue cup, defense counsel stated the court showed the jury "a Dodgers glass that you can see that there's some sort of liquid in it."

5

"THE COURT: Did everybody hear him? He said bourbon. Is it possible it could contain bourbon?

"PROSPECTIVE JURORS (collectively): Yes.

"THE COURT: Is it possible? You bet it is. Is it reasonable? No, of course not. Does everybody understand the distinction? Anything in life is open to some possible or imaginary doubt. It's beyond all reasonable doubt."

The court then explained that a defendant is not required to prove his innocence and the jurors must consider all the evidence in the case before determining whether the defendant is guilty.

Later, outside the presence of the prospective jurors, defense counsel argued that the court's illustration diminished the beyond a reasonable doubt standard to a preponderance of the evidence or reasonable suspicion standard. Stating that the court's "miss-instruction on proof beyond a reasonable doubt" was a structural error, defense counsel asked that the court declare a mistrial or, in the alternative, strike its analogy and read the instruction on the definition of proof beyond a reasonable doubt set forth in CALCRIM No. 220.

The court denied the mistrial motion and stated it would instruct the jury on the definition of reasonable doubt when it was selected and seated.

Later, before the first witness (Jane) testified, the court preinstructed the jury with the standard reasonable doubt instruction, CALCRIM No. 220. The court gave that instruction again after the parties rested and before the jury began its deliberations.

6

B. *Analysis*

Olivarez-Duran asserts the court's "booze analogy" through the use of its blue cup during voir dire constituted structural error because it essentially told the jury "that proof beyond a reasonable doubt is a matter of believing things that are *probably true*" (italics added). He maintains the court committed federal constitutional error by analogizing the concept of proof beyond reasonable doubt "to a rough estimation of the probability the judge's bottle [*sic*] did not contain bourbon." These assertions are unavailing.

In *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*), the California Supreme Court recently explained that "[c]ourts have repeatedly cautioned . . . against using diagrams or visual aids to elucidate the concept of proof beyond reasonable doubt." (*Id.* at p. 662.) The *Centeno* court also explained that "[t]he case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard. [Citations.] We have recognized the 'difficulty and peril inherent in such a task,' and have discouraged such '"experiments"' by courts and prosecutors. [Citation.] We have stopped short, however, of categorically disapproving the use of reasonable doubt analogies or diagrams in argument. Rather, we assess each claim of error on a case-by-case basis." (*Id.* at p. 667.)

The Supreme Court further explained that "[i]t is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt." (*Centeno*, *supra*, 60 Cal.4th at p. 672, citing *Victor v. Nebraska* (1994) 511 U.S. 1, 5 [114 S.Ct. 1239].) Thus, "it is error . . . to

7

suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (*Centeno*, at p. 672, italics omitted.)

However, *Centeno* also explained that "[i]t is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Centeno*, *supra*, 60 Cal.4th at p. 672, citing, e.g., CALCRIM Nos. 224, 226.) To illustrate what is permissible, the Supreme Court stated that in *People v. Romero* (2008) 44 Cal.4th 386 (*Romero*), it "approved the prosecutor's argument that the jury must '"decide what is reasonable to believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable."' [Citation.] We concluded that '[n]othing in [that] explanation lessened the prosecution's burden of proof. The prosecution must prove the case beyond a reasonable doubt, not beyond an unreasonable doubt.'" (*Centeno*, at p. 672.)

Here, the court's analogy through the use of the blue cup, although inadvisable, was permissible under *Centeno* and *Romero*. (See *Centeno*, *supra*, 60 Cal.4th at pp. 667, 672; *Romero*, *supra*, 44 Cal.4th at p. 416.) The analogy only addressed and illustrated one aspect of the beyond-a-reasonable doubt standard of proof and the jury's related fact-finding function: the jury's duty "to 'decide what is reasonable to believe versus unreasonable to believe' and to 'accept the reasonable and reject the unreasonable.'" (*Romero*, *supra*, 44 Cal.4th at p. 416.) The court did not invite the jury to decide what was "probably" in the cup, nor did it invite the jury to decide what was in the cup based on their guesses; and, thus, it did not tell the jury (as Olivarez-Duran contends) that proof beyond a reasonable doubt "is a matter of believing things that are probably true." The

8

court elicited from the jurors suggestions as to what was in the cup, acknowledged it was *possible* the cup contained bourbon, and then emphasized that the standard required proof beyond a *reasonable doubt* because "[a]nything in life is open to some possible or imaginary doubt." The court's remark regarding the *possibility* that the cup contained bourbon was consistent with the standard jury instruction on reasonable doubt, CALCRIM No. 220, which states: "The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The court was merely trying to explain that the jury should reject unreasonable theories and doubts and make a determination, based on the reasonable ones in light of all of the evidence, whether the prosecution had proved its case beyond a reasonable doubt. The court's illustration did not trivialize or lessen the beyond-a-reasonable doubt standard of proof. Accordingly, we reject Olivarez-Duran's claim that the court committed structural error, and we also reject his related contention that the court erroneously denied his defense counsel's request that the court declare a mistrial or retract the illustration and immediately issue the reasonable doubt instruction set forth in CALCRIM No. 220.

Even if we were to assume the court's illustration and comments were in some manner ambiguous or erroneous, we would conclude the court's repeated subsequent instructions under CALCRIM No. 220 cured any such assumed error or ambiguity. In *People v. Medina* (1995) 11 Cal.4th 694, the California Supreme Court explained that "errors or misconduct occurring during jury voir dire, prior to the introduction of evidence or the giving of formal instructions, are far less likely to have prejudiced the defendant." (*Id.* at p. 745.) Here, after the jury was empanelled and before the

9

prosecution called its first witness, the court instructed the jury under CALCRIM No. 220. The court gave that instruction again before the jury began it deliberations. Both instructions fully and correctly defined the beyond-a-reasonable-doubt standard of proof, and Olivarez-Duran does not challenge those instructions on appeal. We presume the jury in this case understood and followed the instructions on reasonable doubt that the court gave under CALCRIM No. 220. (See *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.) We note that although the jury convicted Olivarez-Duran of count 3, it acquitted him of counts 1, 2, and 4. We conclude Olivarez-Duran has failed to demonstrate a reasonable likelihood the jury understood or applied the court's challenged remarks during voir dire in an unconstitutional manner. (See *Centeno, supra,* 60 Ca1.4th at p. 667.) Accordingly, we affirm the judgment.

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

McINTYRE, J.

IRION, J.

10