Filed 2/18/22  P. v. Salazar CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY W. SALAZAR et al.,<br><br>    Defendants and Appellants. | B309409<br><br>(Los Angeles County Super. Ct. No. VA044027) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL T. HIRIARTE,<br><br>    Defendant and Appellant. | B310729<br><br>(Los Angeles County Super. Ct. No. VA044027) |

APPEALS from orders of the Superior Court of Los Angeles County, Lillian Vega Jacobs, Judge. Reversed and remanded with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Christopher DeHerrera.

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant Daniel T. Hiriarte.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant Anthony W. Salazar.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Allison H. Chung, and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Christopher DeHerrera, Daniel Hiriarte, and Anthony Salazar appeal from trial court orders denying petitions for resentencing under Penal Code section 1170.95.[1] Based on the record of conviction in this matter, we cannot conclude that Salazar, DeHerrera, and Hiriarte are ineligible for relief as a matter of law. We will therefore reverse the trial court's orders and remand. On remand, the trial court will issue orders to show cause why Salazar, DeHerrera, and Hiriarte are not entitled to relief under section 1170.95.

## BACKGROUND

"Salazar, De[H]errera and Hiriarte were members of the Maywood Locos gang. On May 31, 1997, Salazar (wearing a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

yellow and blue jacket) met up with De[H]errera and Hiriarte a few blocks away from Slauson Avenue (the 'boundary' between the Locos gang's 'territory' and the 'territory' occupied by the 18th Street gang). The three men walked across Slauson, into an area they knew was 18th Street territory. Meanwhile, Victor Vaca (the victim) and three other men (Javier Perez, Juan Vaca and Pedro Marin) were 'socializing' in a parking lot. Perez saw two men approach, heard one ask Vaca something about '18,' then heard and saw a shot. Perez ducked behind a van, then heard more shots that sounded as though they were coming from two different guns. Perez stood up and saw two people run through the parking lot toward the street. One of the shooters (later identified as Salazar) was wearing a yellow and blue jacket.

"A security guard (Daniel Gonzalez) driving through the area heard approximately 10 gunshots fired in rapid succession. He then saw three men dart in front of his car, running away from the direction of the shooting. One of the men (later identified as Salazar) was wearing a yellow and blue jacket and was attempting to keep a small but heavy object in his waistband. The man in the yellow and blue jacket was about five feet, six inches tall, 'a little chubby,' about 18 to 20 years old, with a shaved head (the description fits Salazar). The police arrived within a few minutes and Gonzalez gave them descriptions of the three men who had run in front of his car. About five minutes later, Gonzalez positively identified Salazar (who was running from the area of the shooting when he was detained by another police officer). Salazar, armed with a loaded 9-millimeter pistol and carrying a can of red spray paint, was still wearing his blue and yellow jacket. De[H]errera and Hiriarte were identified by Jack Zebris, another Locos member who had

been with Salazar earlier in the day and who was present when Salazar met up with De[H]errera and Hiriarte.

"Salazar, De[H]errera and Hiriarte were charged with Vaca's murder.  At trial, the People presented evidence of the facts summarized above.  In addition, there was testimony by a gang expert and other evidence showing that the red paint in Salazar's spray can matched paint found on Salazar's jacket and on a wall directly across the street from the crime scene (it had been used to cover 18th Street graffiti with Loco graffiti).  Several .45-caliber casings were recovered from the scene.  A .45-caliber bullet and two .357-caliber bullets were recovered from Vaca's body (the .357-caliber gun was found in a nearby trash can.  The .45-caliber gun that matched the bullet found in Vaca's body was later found in Salazar's possession." (*People v. Salazar* (Mar. 29, 2000, B127918) at pp. 2-3 [nonpub. opn.] (*Salazar I*).)

Salazar, DeHerrera, and Hiriarte were each charged with the first degree murder of Victor Vaca (count 1) and attempted murder of two other victims (counts 5 and 6).  Salazar was also charged with the murder of a fourth victim (count 2), the attempted murder of a fifth victim (count 4), and assault with a firearm on a sixth victim (count 3).

Before closing argument, the People moved to dismiss counts 3, 4, 5, and 6.  Among other jury instructions, the trial court instructed the jury that "[a] conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder, and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.  Conspiracy is a crime, but is not charged as such in this case." (CALJIC No. 6.10.5.)

4

The trial court further instructed the jury that "[e]ach member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or declaration is in furtherance of the object of the conspiracy. [¶] . . . [¶]  [A member of a conspiracy is not only guilty of the particular crime that to [his] . . . knowledge [his] . . . confederates agreed to and did commit, but is also liable for the natural and probable consequences of any [crime] [act] of a co-conspirator to further the object of the conspiracy, even though that [crime] [act] was not intended as a part of the agreed upon objective and even though [he] . . . was not present at the time of the commission of that [crime] [act].  [¶]  You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes[, and, if so, whether the crime alleged [in Count[s] 1] was perpetrated by [a] co-conspirator[s] in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy].]"  (CALJIC No. 6.11, brackets in original jury instruction.)

After the jury was instructed, and after all three defendants had closed with argument, the People closed with final argument before the jury retired to deliberate.  The People explained to the jury that "none of the three [defendants] are being charged with being the killer in this case.  None of the three are being charged with firing a gun.  Under conspiracy law that doesn't need to be proved."  Based on the uncharged conspiracy, the People spent a substantial amount of time in closing discussing the conspiracy instructions.  Pertinent to the questions on these appeals, as the prosecutor walked through the law of conspiracy with the jury, the People told the jury:

"[W]hat's interesting is the next paragraph [in CALJIC No. 6.11], and the next paragraph basically says that even if one of the three [defendants] didn't really want to kill somebody and went there for something a little lesser of a reason, such as to threaten folks, terrorize them a little bit without necessarily killing someone, they are still responsible for murder because murder is a natural and probable consequence of going into rival gang neighborhood and terrorizing and threatening folks and spray painting 187 on the wall. [¶] A member of a conspiracy is not only guilty of the particular crime that, to his knowledge his confederates agree to and did commit, but is also liable for the natural and probable consequences of any crime of a co-conspirator to further the object of the conspiracy, even though that crime or act was not intended as a part of the agreed-upon objective and even though he was not present at the commission of that crime."

The jury convicted Salazar, DeHerrera, and Hiriarte of first degree murder on count 1 and found Salazar not guilty of murder on count 2. We affirmed the trial court's judgments in *Salazar I*, *supra*, B127918 at page 12.

Salazar, DeHerrera, and Hiriarte each petitioned the trial court for resentencing under section 1170.95. In each case, the trial court appointed counsel, and as to Salazar and DeHerrera, the trial court issued orders to show cause why Salazar and DeHerrera should not be resentenced.[2]

---

[2] The petitions were initially handled by different trial judges. Salazar and DeHerrera were initially assigned to the same trial judge, and Hiriarte was assigned to a different department (where he had another issue pending in the same case). All three petitions were ultimately heard by the same trial

6

Salazar's and DeHerrera's petitions were heard and denied on November 20, 2020. The trial court heard and denied Hiriarte's petition on February 9, 2021. In each case, the trial court concluded that the appellants were ineligible for relief under section 1170.95 as a matter of law because their convictions were based on the uncharged conspiracy, and were not based on either felony murder or the natural and probable consequences doctrine. At Salazar and DeHerrera's hearing, the trial court explained that the defendants could "be convicted today of murder, notwithstanding the changes made to section 188 and 189 under a theory of conspiracy to commit murder. A reasonable jury could find both defendants guilty of murder with the requisite mental state for first degree murder based on the facts . . . evidenced in the record of conviction."

Salazar, DeHerrera, and Hiriarte filed timely notices of appeal. We consolidated the matters for argument and opinion.

## DISCUSSION

Salazar, DeHerrera, and Hiriarte each contend that their petitions set forth a prima facie showing to entitlement for relief under section 1170.95 because the prosecutor's closing argument at their trial allowed the jury to convict each of them based on the natural and probable consequences doctrine. Salazar and DeHerrera also contend that they were deprived of due process in the trial court based on the issuance of an order to show cause by one trial judge and a later denial of their petitions without

judge. The record does not reflect whether the trial court issued an order to show cause on Hiriarte's petition, but it is clear from the record that the trial court appointed counsel for Hiriarte and allowed briefing on whether Hiriarte's petition made a prima facie showing for relief under section 1170.95.

7

holding the evidentiary hearing referenced in section 1170.95, subdivision (d)(1) by a different trial judge. Because we conclude that Salazar, DeHerrera, and Hiriarte may have been convicted of murder based on the natural and probable consequences doctrine, we do not reach Salazar and DeHerrera's due process argument.

Section 1170.95 provides, pertinent to these appeals, that "[a] person convicted of . . . murder under the natural and probable consequences doctrine . . . may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or any other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . . [¶] (2) The petitioner was convicted of murder . . . following a trial . . . . [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

The statute delineates what constitutes a facially sufficient petition, and requires the trial court to appoint counsel for the petitioner upon receiving a facially sufficient petition in which the petitioner has requested counsel. (§ 1170.95, subd. (b).) Upon the filing of a facially sufficient petition and the appointment of counsel, the statute provides for a briefing schedule, after which the trial "court shall hold a hearing to determine whether the petitioner has made a prima facie case for

8

relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).)

Salazar, DeHerrera, and Hiriarte were convicted of first degree murder based on an uncharged conspiracy to commit murder. They contend, however, that the prosecutor's explanation of the instructions to the jury may have led the jury to understand that they could convict the defendants of murder even if one of the defendants had participated in the conspiracy with the intent that the group would commit something less than murder. The appellants focus on this statement in the prosecutor's closing argument: "[T]he next paragraph basically says that even if one of the three [defendants] didn't really want to kill somebody and went there for something a little lesser of a reason, such as to threaten folks, terrorize them a little bit without necessarily killing someone, they are still responsible for murder because murder is a natural and probable consequence of going into rival gang neighborhood and terrorizing and threatening folks and spray painting 187 on the wall. [¶] A member of a conspiracy is not only guilty of the particular crime that, to his knowledge his confederates agree to and did commit, but is also liable for the natural and probable consequences of any crime of a co-conspirator to further the object of the conspiracy, even though that crime or act was not intended as a part of the agreed-upon objective and even though he was not present at the commission of that crime."

The People rely largely on the text of the jury instructions themselves, and contend that the language in CALJIC No. 6.10.5—"A conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of

9

murder . . ."—controls the outcome here. That argument appears to have persuaded the trial court. At argument on Salazar's and DeHerrera's petitions, the trial court pointed out that in addition to the language in CALJIC No. 6.11 and the prosecutor's closing argument, "the jury also received an instruction indicating that the jury had to abide by the instructions given, and counsel's argument was that, argument."

In isolation, the jury instructions appear to support the People's argument. The instructions appear on their face to instruct the jury that to find any defendant guilty, the jury must conclude that the defendant had the "specific intent to agree to commit the crime of murder." The jury was instructed in CALJIC No. 1.00 that it "must accept and follow the law as [the trial court] state[s] it . . .," and "[i]f anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with [the trial court's] instructions on the law, [the jury] must follow [the trial court's] instructions."

The last thing the jury heard before it retired to deliberate, however, was an explanation of the natural and probable consequences doctrine that would have allowed the jury to convict any one of the defendants based on the natural and probable consequences doctrine even if that particular defendant had participated in the conspiracy without understanding that the objective was murder.

We view the analysis here as similar to our analysis in *People v. Offley* (2020) 48 Cal.App.5th 588. There, we said, "we cannot rule out the possibility that the jury relied on the natural and probable consequences doctrine in convicting Offley. The trial court instructed the jury on the natural and probable consequences doctrine as part of its instruction on conspiracy

10

liability: 'A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime of a co–conspirator to further the object of the conspiracy, even though that crime was not intended as a part of the agreed upon objective and even though he was not present at the time of the commission of that crime.'

"The prosecutor argued that the jury could convict the defendants on the basis of this instruction. In closing arguments, the prosecutor argued that the defendants were part of a conspiracy, that the 'common design of [the] conspiracy' was 'assault with a firearm,' and that any member of the conspiracy was 'guilty of, not only that particular crime, but also the natural and probable consequence of any crime of the co-conspirator.'

"We cannot exclude the possibility that the jury believed Offley acted without intending to kill Barrales or consciously disregarding that risk. The jury might have concluded that Offley intended to take part in a conspiracy to commit assault with a firearm, or to fire into an occupied vehicle, with the aim of either injuring or merely frightening Barrales. The jury could have then concluded that Barrales's death was the natural and probable consequence of the conspiracy and convicted him of murder without finding beyond a reasonable doubt that he acted with malice aforethought. For this reason, we cannot say that Offley 'is ineligible for relief as a matter of law.' " (*People v. Offley*, *supra*, 48 Cal.App.5th at p. 599.)

We disagree with the trial court's conclusion that the jury instructions themselves cured the problem created by the prosecutor's argument in this case. Our Supreme Court has explained that " '[w]hen argument runs counter to instructions

11

given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676.)  As in *Centeno*, however, "[t]hose saving factors are not present here." (*Ibid.*)  In *Centeno*, the Supreme Court explained that "[t]here was no reason for the jury to reject the prosecutor's hypothetical.  *It did not directly contradict the trial court's instruction on proof beyond a reasonable doubt*, but instead *purported to illustrate that standard*." (*Ibid.*, italics added.)

Similarly, the prosecutor's statement here did not contradict the trial court's instruction about what the People had to prove on the uncharged conspiracy theory for the jury to find the defendants all guilty of murder.  Rather, the prosecutor's statement purported to *explain* the instruction—to tell the jury specifically that they could convict any one of the defendants for murder even if they concluded that the particular defendant participated with an understanding that they were conspiring to commit some lesser crime.

In *Centeno*, as here, the trial court did not reinstruct on the concept affected by the prosecutor's argument.  "As a result, the prosecutor's argument was the last word on the subject." (*People v. Centeno, supra,* 60 Cal.4th at p. 677.)

As in *Offley*, we cannot say here that Salazar, DeHerrera, and Hiriarte are ineligible for relief as a matter of law.

## DISPOSITION

The trial court's orders are reversed.  On remand the trial court will issue orders to show cause why the appellants are not

entitled to relief under section 1170.95, subdivision (c) and conduct further proceedings in accordance with section 1170.95.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.