Filed 6/26/26  P. v. Morse CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY MORSE,<br><br>        Defendant and Appellant. | A171018<br><br>(Alameda County Super. Ct. No. 22CR012310) |

A jury convicted Timothy Morse of multiple sex offenses against Jane Doe.  Morse's main contentions on appeal are that his trial counsel rendered ineffective assistance by failing to object to expert testimony that exceeded the scope of permissible Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony, and by failing to object to the prosecutor's mischaracterization of the People's burden of proof in her closing argument.  We find no prejudicial error and affirm the judgment.

**BACKGROUND**

The People filed an information charging Morse with nine counts of lewd acts upon a child under 14 (Pen. Code[1], § 288,

_____

[1] All further statutory references are to the Penal Code.

1

subd. (a)), three counts of sexual penetration of a child under 14 who was 10 or more years younger (§ 289, subd. (j)), and two counts of oral copulation of a person under 14 who was 10 or more years younger (§ 287, subd. (c)(1)).[2]

The victim, Jane Doe, was 14 when she testified at trial. Morse was the husband of Jane's great aunt, Grandma Ag. Jane had known Morse since she was born.

In September 2020, Jane turned 11 years old. At that time, Morse and Grandma Ag would come over once a week to have dinner and Morse would help Jane with homework. Jane's mom and stepfather would sometimes leave after dinner to get ice cream, and Jane and her siblings would stay with Morse and Grandma Ag. Morse and Jane would do her math homework in her bedroom. When they were doing homework, Jane would keep her bedroom door closed because her siblings were loud.

In September 2020, Morse did something in Jane's room that made her uncomfortable. After they finished Jane's homework, Morse and Jane would play the "dark game," which was "basically hide and seek in the dark." Jane testified that, in this incident that made her feel uncomfortable, her pants somehow came off while she was on her bed. Morse touched her inner thighs, lower stomach, and vagina. Jane did not say anything.

---

[2] On the People's motion, the court subsequently dismissed one count under section 288, subdivision (a), and one count under section 287, subdivision (c)(1).

The next Wednesday, something happened again. Morse helped Jane with her homework after dinner, and they played the dark game. Morse again rubbed Jane's vagina while she was on her bed. She had a top on without underwear or pants, and she could not remember how her pants and underwear came off. Morse kissed Jane's stomach and thighs. This lasted for about two minutes and less than five minutes. Jane didn't say anything to her family.

The following week, Morse and Grandma Ag came over for dinner again, and Morse and Jane went to her room after dinner, did her homework, and played the dark game. Jane did not remember how her pants came off, but Morse rubbed her vagina again and put his finger inside Jane's vagina, which hurt. This took less than five minutes. Before they went back downstairs, Morse told Jane not to tell anyone about the game because they would get in trouble.

The fourth incident was also during September 2020. The same thing happened, except this time Morse unbuckled his pants. Morse rubbed Jane's vagina, put his finger inside her vagina, and had Jane touch his penis with her hand. Morse told Jane not to say anything.

The fifth incident occurred the following week. After dinner, Morse and Jane went to her room and did her homework. They played normal hide and seek for a while and then Jane somehow ended up on the bed. They were both on their backs on the bed, and Morse touched her vagina and put his finger inside it. Morse put Jane's hand on his penis and made her move her

hand up and down.  They heard Jane's parents coming into the garage downstairs, so they got dressed and went downstairs. Morse told Jane not to say anything about the game.  Jane was afraid she had done something wrong and would get in trouble if she said anything.

Jane also testified that, during one of the incidents, Morse put his mouth on her vagina.  He asked Jane if she liked it and she said no, so he stopped.

After the fifth incident, Jane told her mom or stepfather that she didn't need help with her homework anymore.  Morse still came over to her house, but they didn't go to her room anymore.  Jane later had her parents take the door off her bedroom.

Jane told her parents about Morse's abuse about a year and a half later.  She had been getting in trouble for having bad grades and skipping school.  Jane's mom asked her if there was anything else she hadn't told her, and Jane told her about the abuse because she was getting in trouble a lot and nothing could make it worse.  Jane had to go to a place to talk to a lady and a police officer.  A female police officer had Jane call Morse on the phone and had her say what the officer had written down.

On cross-examination, Jane stated that she had read her earlier testimony in the case and talked to a prosecutor before coming to court.  Jane did not remember telling the CALICO[3] interviewer that everything happened when she was 11.  She

_____

[3] CALICO is the Child Abuse, Listening, Interviewing, and Coordination Center.

4

didn't remember how her pants came off, and didn't remember telling CALICO that Morse made her take her pants off.

Jane did not remember telling CALICO that Morse "would put [her] on the bed," she said she did not remember how she got on the bed, and she testified that Morse never put her there. Jane did not remember telling CALICO that Morse made her lie on top of him when she was fully undressed, and she testified that she was never on top of him or fully undressed.

Jane didn't remember telling the prior prosecutor that Morse pulled down her pants and lifted her onto the bed. Jane testified that Morse had her touch his penis during the last two incidents, and she was wrong when she told the prior prosecutor that this also happened during the second incident. Jane did not remember telling Morse that it hurt when he put his finger into her vagina or telling the prior prosecutor that she had said that and that was why he stopped.

Defense counsel elicited additional inconsistencies between Jane's CALICO statements, her preliminary hearing testimony, and/or her trial testimony about: (1) how Jane's pants came off during the incidents; (2) Jane's preliminary hearing testimony that she was sitting on Morse's face during one incident; and (3) her CALICO statement about kissing Morse's penis once. Jane testified that she didn't know if she had told CALICO the truth about the third statement or whether she had been lying during her preliminary hearing regarding the second statement.

Jane's great aunt and stepfather testified that Morse would come to dinner at Jane's house once a week in the fall of 2020,

and Morse helped Jane with her homework. Jane's stepfather testified that he and his wife had been yelling at Jane about her school performance when she disclosed the abuse. The People also called an expert to discuss CSAAS, Dr. Carmichael, and we describe his testimony in greater detail in our discussion, *post*.

Finally, the People called Officer Sanchez, who testified that she took Jane to a CALICO interview and had Jane make a pretext call to Morse after the interview while Sanchez listened to the call. Sanchez explained that a pretext call "is an investigative technique that [police] often use in child abuse and sex assault cases. It's when you try and elicit some sort of information from the suspect to see if they'll admit to a crime or apologize to the victim." The prosecutor played the recording of the pretext phone call for the jury, and Sanchez identified the voices as those of Jane and Morse.

On the pretext phone call, Jane asked Morse if he would come over to help her with math again, and he agreed to do so. Jane asked, "Um, you know how we used to play the dark game? Would you still want to play that? Like in return?" Morse said, "No. I mean, [Jane.] I would, that's an interesting question. I would, I would never say no to you, period. End of story. But I would not be expecting that, right?" Jane asked, "Well, I mean, is it like weird that I'm older now?" Morse responded, "No, I don't. No, it's, it's less weird. It's just, it's just that, um, I, I, uh, it's not weird at all but . . . I, I just can't — it's hard for me to express how I feel about you cause I love you more than just about anybody. I told you that before."

6

Jane said she would "be down if, like, if you wanted to." Morse responded, "Okay, well let's keep that in mind. That I will definitely keep that in mind." He continued, "I just don't want to you to think that, you know, that I, I'm wanting to help you cause of that." He said, "I would wanna do that cause of [inaudible]. So I'll, I'll definitely, uh, I'll, I will not, uh, say no to you [inaudible]." Jane asked if he would "want to do it tomorrow," and Morse said, "Sure." In response to her question about what his favorite part of the dark game was, Morse said, "You." She asked, "Like what part of me?" He said, "Just all, everything all about you. There's, there's, there's, there's just no part of you that's not like amazing." Jane asked if Morse missed "doing it," and he answered affirmatively.

Jane asked, "So like, what do you wanna do tomorrow? Like." He responded, "I want do whatever it is you want me to. Um, I want to um (inaudible) it's hard, [Jane], because I don't wanna be like the bad guy, you know?" He continued, "I don't want to be somebody, uh, that influences you in a, in a wrong way. Cause I love you so much." He said, "I love you as my, my niece, my great-niece first and as a beautiful young lady. But you're — there's, there's way too much about you that's so attractive."

Jane again asked, "So like, what do you wanna do to me tomorrow?" Morse responded, "Uh, I would like to, um, explore your, your feelings and your, your, your body to the degree that you would want to." He continued, "Touch you wherever you want me to touch you." She started saying, "That sounds . . ." He

interrupted, "I would really want it to be, [Jane], that I am not the one initiating it, but that you are." Jane confirmed that it was her initiating it, and Morse said, "It's really quite exhilarating. Cause I've never stopped, uh, like, I never stopped thinking about you." Towards the end of the call, Morse said, "There's . . . a spot we have to stop, but other than that, we can totally explore."

A recording of the pretext phone call was admitted into evidence.

Morse did not call any witnesses, and the jury returned guilty verdicts on twelve counts under sections 288, subdivision (a), 287, subdivision (c)(1), and 289, subdivision (j). The court sentenced Morse to 18 years in prison, and he timely appealed.

## DISCUSSION

To prove ineffective assistance of counsel, Morse must establish that his counsel's performance fell below an objective standard of reasonableness, and, but for the error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Carter* (2005) 36 Cal.4th 1114, 1189.) If Morse makes an insufficient showing on either component, his claim fails. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

"A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter*, *supra*, 36 Cal.4th at p. 1189.) "If the record on appeal sheds no

8

light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*Ibid.*)

As for prejudice, "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 111–112.) "The likelihood of a different result must be substantial, not just conceivable." (*Id.* at p. 112.) " 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*Smith v. Robbins* (2000) 528 U.S. 259, 286, fn. 14.)

## I.   The CSAAS Claim

CSAAS testimony has long been "admissible to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the

9

emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

"However, pursuit of that laudable rehabilitative purpose must not lead the expert to cross over into affirmatively vouching for the truthfulness of a complainant's allegations against the defendant." (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479–480.)  CSAAS testimony "is not admissible to prove that the complaining witness has in fact been sexually abused." (*People v. McAlpin, supra*, 53 Cal.3d at p. 1300; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171.)

With these parameters in mind, we turn to Dr. Carmichael's testimony and then to Morse's claims of error.

### A. Dr. Carmichael's Testimony

The prosecutor offered Dr. Carmichael, a clinical psychologist, as an expert in "child sexual abuse and trauma." Dr. Carmichael did not review any reports in the case or talk to Jane Doe.  He had no opinion on the truth of the allegations in the case or on Jane Doe's credibility.

Dr. Carmichael discussed the differences between common expectations regarding how children respond to abuse and his professional experience with this response.  There is no typical or correct way for a child to respond to abuse.  One common misconception is that an abused child would appear angry or sad and would seek to avoid the perpetrator.

When asked whether there were different categories or types of misconceptions, Dr. Carmichael responded affirmatively and said that one has to do with children delaying their

disclosures. He stated, "And so really while there may be some better understanding a lot of kids delay their disclosures, I think that's something people have talked about recently in the media, we know a lot more than that thin slice about the Sandusky and Cosby. Those are very small samples about what we know about these kids."

Dr. Carmichael described the "relationship dynamic" between children and their abusers, saying there is still "a lot of ambivalence" towards the idea that children are abused by people they know. He explained that children sometimes continue to spend time with an abuser, who might be someone known, trusted, or loved. This dynamic also can lead to a child feeling guilty, ashamed, or embarrassed to report abuse.

The prosecution asked whether children are more likely to be abused by strangers or people they know, and Dr. Carmichael confirmed it was the latter. Often, the abuser is trusted and is an important person to the child, the abuser establishes a relationship with the child, and the child is supposed to love or respect them. The abuser then starts integrating sexual contact or conversations, normalizing these things, called "grooming." Dr. Carmichael explained that this relationship dynamic, rather than physical threats or force, is often the reason why children stay silent and do not report the abuse. He also testified regarding the power dynamic between the abuser and the child, which can lead to the child feeling isolated and that he or she won't be believed if they report the abuse.

The prosecutor then asked: "Kind of shifting gears. Is it unusual for a child who's being sexually abused to not show any outward signs that they're being abused?" Dr. Carmichael said it was a misconception that kids will always appear upset or angry about what happened or even about the perpetrator themselves. Research has shown that children can appear stoic even when talking about abuse.

The prosecutor asked, "Even if there are no outward signs of abuse, do children who are being abused sometimes act out?" Dr. Carmichael responded: "[K]ids might be agitated enough to do things that are out of character, right? So a lot of times, especially with younger kids even adolescents, like depression and anxiety, you don't see the outward displays of those emotions per se, but their behavior, impulsivity those things might change." The prosecutor continued: "Could doing poorly in school be an example of how a child starts acting out or responding to abuse?" Dr. Carmichael responded, "Sure. One of the things that can happen, not all kids, but [what] can happen is kids actively try to ignore, and avoid, and not think about the bad stuff . . . . So, if you're in class, you get distracted. Your attention is drawn elsewhere and you're kind of preoccupied with something else, so I can't expect you to watch the assignment and keep track, right? So that can certainly lend itself to school problems. So, that can absolutely be part of the [sic] what the kid is enduring. They get in trouble with the school, the grades are going lower, that's a problem."

12

Dr. Carmichael discussed an additional misconception that adults would be able to perceive abuse happening, and he reiterated that children often maintain an ongoing relationship with an abuser. He also explained that abused children may "numb out" and try to ignore what is going on (called disassociation). This coping mechanism can impair a child's ability to recall specific, rather than core, details about the abuse.

When asked again about delay, Dr. Carmichael responded, "There are some kids that tell quickly, matter of days or weeks. Depending on the research that we're looking at, the majority of kids don't tell till after many months, years or even till after they turn 18. We know that lengthy delays can and do occur." He also stated, "The younger the child is, the closer the relationship the child has with their perpetrator, we tend to see longer delays . . . ."

Dr. Carmichael testified in more detail about the possibility that children will give inconsistent testimony about abuse, especially where there have been many incidents of abuse. At that point, the prosecutor asked him to talk about the preferred method for interviewing children who disclose abuse. Dr. Carmichael said that the preferred method was to ask open-ended questions and get more specific if needed. At that point, he continued, "The thing to consider, though, even when you ask a leading question or a misleading question, it does not uniformly lead to inaccurate or false information, right? Kids who have been abused are actually pretty resistant to being misled into saying they were touched, when, in fact, they had not been. And

it's easier to influence someone to talk about a positive event or a plausible event, something that's possible for them, as opposed to endorsing falsely that a negative event occurred."

### B. Analysis

Morse contends his trial counsel was ineffective for failing to object to Dr. Carmichael's testimony when: (1) the prosecutor requested that Dr. Carmichael be qualified as an expert in " 'child sexual abuse and trauma', not simply as an expert in CSAAS theory," which implied Dr. Carmichael would give improper testimony; (2) Dr. Carmichael discussed attributes of perpetrators of sexual abuse, providing "character / profile" evidence; (3) he referenced Bill Cosby and Jerry Sandusky; (4) he testified that abused children are resistant to suggestive questioning; and (5) he gave testimony on predictive characteristics of abused children—namely that an abused child may act out and do poorly in school.

With respect to Morse's first contention, we agree with the People that Morse does not argue or establish that Dr. Carmichael was not qualified as an expert on child sexual abuse and trauma, and Morse does not establish that his trial counsel was ineffective for failing to object at the outset to an alleged "implication" that Dr. Carmichael's future testimony might go beyond the scope of CSAAS.

We also reject Morse's claim that Dr. Carmichael gave impermissible testimony about the character of a perpetrator. Dr. Carmichael testified that children are more likely to be abused by someone they know and it is common for abusers not

14

to use physical force to keep children quiet because of this relationship dynamic, and Dr. Carmichael described grooming—introducing sexual contact and conversations "to normalize that sexual stuff in a preexisting relationship."  His testimony elaborated on the context in which child abuse generally occurs and dispelled a common misunderstanding as to the relationship between victims and their abusers.  (See *People v. McAlpin, supra,* 53 Cal.3d at pp. 1302–1303 [one popular notion requiring correction is layperson imagines offender is a stranger]; *People v. Sedano*, *supra*, 88 Cal.App.5th at p. 482 [testimony that 94% of child abusers are not strangers was permissible].)  This testimony also helped the jury understand child-victim secrecy and reporting behavior.  Such testimony falls within the ambit of permissible CSAAS evidence to counter common misconceptions about child sexual abuse and explain why child sexual abuse victims may delay reporting abuse.[4]  (*People v. Sedano,* at p. 479.)

Dr. Carmichael's testimony that children who are abused are "pretty resistant" to being misled into lying about abuse, on the other hand, seems to have crossed the line.  (*People v.*

---

[4] Without directly asserting impropriety, Morse also states in his opening brief that Dr. Carmichael gave "predictive testimony" when he testified that the majority of children do not report abuse for many years and both the young age of a child and the closeness of the relationship to the abuser can lead to longer delays.  If Morse intended to claim ineffective assistance in his counsel's failure to object to this testimony, his claim fails.  (See *People v. Sedano*, *supra*, 88 Cal.App.5th at pp. 481–483 [expert testimony that delayed disclosure was more the rule than the exception and giving statistics on delayed reporting was admissible].)

*Lapenias*, *supra*, 67 Cal.App.5th at p. 179 [expert testimony that it was "rare" for children to make false allegations of sexual abuse was inadmissible].)  But even if we accept the failure to object to this testimony as error, and even if we also accept that counsel should have objected to the testimony that an abused child may do poorly in school and to the reference to Cosby and Sandusky because both "had nothing to do with CSAAS" as Morse claims, we still reject Morse's ineffective assistance claim because he does not establish prejudice.  (*Smith v. Robbins*, *supra*, 528 U.S. at p. 286, fn. 14.)

Dr. Carmichael's testimony on these three topics was brief, as was the prosecutor's sole reference to child abuse causing poor school performance in her rebuttal closing argument.  The prosecutor reminded jurors that Dr. Carmichael had not testified that Jane Doe was telling the truth, which was the issue for the jury to decide.  The statements Morse made in the pretext phone call provided strong evidence supporting Jane Doe's testimony, as the prosecutor argued, and the jury deliberated only an hour and seventeen minutes.  Furthermore, the court instructed the jury that: "[T]estimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged . . . . [¶]  You may consider this evidence only in deciding whether or not Jane Doe's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of [Jane Doe]."  (CALCRIM No. 1193.)  The court also instructed that jurors were not bound by an expert's opinion, and they were the sole judge of the

16

credibility of the witnesses. (See CALCRIM No. 332; CALCRIM No. 226.) We presume the jurors understood and followed the instructions. (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 180.)

In sum, on this record, we find that it is not reasonably probable that Morse would have received a more favorable result in the absence of the aspects of Dr. Carmichael's challenged testimony that we have assumed were improper. (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 180.)

## II. The Prosecutorial Misconduct Claim

### A. Challenged Remarks from Closing Argument

Morse maintains that the prosecutor committed misconduct by arguing that a reasonable account of the evidence satisfied her burden of proof and by referring to facts not in evidence.

The prosecutor started her argument by telling the jury that it was her burden to prove the case beyond a reasonable doubt, and she then defined the standard accurately for the jury: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." At the same time, she showed the jury a slide with the beyond a reasonable doubt jury instruction.

Morse challenges the remarks the prosecutor made thereafter (referred to herein as the prosecutor's first set of comments): "So this is not a beyond-all-doubt standard. The question here is what is reasonable. What is a reasonable versus

17

an unreasonable doubt. [¶] And that's a very important word, reasonable.  How do you, as our jury, how do you as the finders of fact in this case decide what is reasonable versus what is unreasonable.  Well, when we picked you as jurors, we did not ask you to leave your common sense at the door.  You can and you should use your common sense in deciding what is a reasonable conclusion based on the evidence in this case."

Morse also challenges the following statements from various points in the prosecutor's closing argument (referred to herein as the prosecutor's second set of comments): "[C]ommon sense is going to play a very important role in your evaluation of the evidence and the testimony in this case in deciding what is reasonable versus what is unreasonable and, like what we talked about in voir dire, who is telling the truth and who is telling a lie."  "In deciding whether testimony is true and accurate, use your common sense and experience."  The prosecutor stated that, among other things, the jury should consider, "How reasonable — again that word 'reasonable' — is the testimony when you consider the evidence?"  "It's been over three years since this happened.  It is not reasonable to expect that she's going to get every detail perfect, that she's going to get every single detail right."  And, "That's what she did.  She told you the truth the best she could remember it.  And now calling her a liar because of the way that she's remembering things over time, it's just not reasonable."

Finally, Morse contends that statements about corroborating evidence and credibility were improper (hereinafter

18

the prosecutor's third set of comments): "[T]he testimony alone of a victim of sexual assault is enough, can be enough if you find it credible and believable to prove that a crime of sexual assault happened." And, "The prior statement that she said about sitting on his face. She didn't remember that during trial, but you can use that — you can accept that as true if you found it credible."

### B. Analysis

This part of Morse's ineffective assistance claim relies mainly on *People v. Centeno* (2014) 60 Cal.4th 659, 674–677 (*Centeno*), wherein our high court found counsel constitutionally ineffective for failing to object to prosecutorial misconduct in a child molestation case. In *Centeno*, one problem with the prosecutor's argument was that it "strongly implied" the People's burden was met if the People's theory was reasonable. (*Id.* at p. 671.) "The prosecutor told the jury that in reaching its decision it must reject impossible and unreasonable inferences, and only consider reasonable possibilities. She stated that 'your decision has to be in the middle. It has to be based on reason. It has to be a reasonable account.' " (*Ibid.*) *Centeno* acknowledged that "it is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Id.* at p. 672.) But it is not sufficient "that the jury simply believe that a conclusion is reasonable. [The jury] must be convinced that all necessary facts have been proven beyond a reasonable doubt." (*Id.* at p. 672.) "[I]t is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof*."

19

(*Ibid*.)  The prosecutor "confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt.  She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence.  These remarks clearly diluted the People's burden." (*Id*. at p. 673.)  And counsel's failure to object was prejudicial given the closeness of the case (main witnesses changed their stories dramatically at trial) and the lack of any corrective action after the error (objection, judicial admonition, or judicial instruction on the concept of reasonable doubt).  (*Id*. at pp. 676–677.)

Here, the prosecutor's second set of comments related to the jury's evaluation of whether the testimony was reasonable or unreasonable.  In fact, in one of the challenged remarks, the prosecutor read almost verbatim from CALCRIM No. 226.  This second set of comments was not objectionable.  (*Centeno*, *supra*, 60 Cal.4th at p. 672 [argument that jury must decide what is reasonable versus unreasonable to believe and accept the reasonable and reject the unreasonable does not lessen prosecution's burden of proof].)

Whether aspects of the prosecutor's first set of the comments — particularly her statement that "[y]ou can and you should use your common sense in deciding what is a reasonable conclusion based on the evidence in this case"—crosses the line described in *Centeno* presents a closer question.  We need not ultimately decide whether these comments were erroneous or whether counsel was deficient for failing to object, however,

20

because Morse has not established that the first set of comments was prejudicial.

Here, the prosecutor began her argument by correctly defining proof beyond a reasonable doubt while showing jurors a slide with the jury instruction. She told the jurors the judge would read them the instruction when argument was done and they would get a copy of the instruction. Defense counsel then correctly explained the burden of proof to the jurors. And, importantly, the court instructed the jury after the closing arguments with the standard instruction on the presumption of innocence, reasonable doubt, and the prosecutor's burden of proof. (CALCRIM No. 220.) The court instructed the jury on circumstantial evidence and the beyond a reasonable doubt standard (CALCRIM No. 224.) The court also instructed the jury that nothing the attorneys said was evidence (CALCRIM No. 222), and, if the attorneys' comments on the law conflicted with the court's instructions, the jury must follow the instructions (CALCRIM No. 200). Unlike in *Centeno*, the court had the accurate "last word." (*Centeno*, *supra*, 60 Cal.4th at 677.)

Next, this is not the "very close case" presented in *Centeno*. (*Centeno*, *supra*, 60 Cal.4th at p. 677.) In *Centeno*, the prosecutor's case depended on the victim's testimony, the victim did not voluntarily report the molestation, and the victim initially testified at trial that the defendant had not touched her at all. (*Ibid.*) The victim's father, who previously reported seeing the defendant lying on the victim, also changed his testimony at trial. (*Ibid.*) In this case, there were inconsistencies in Jane Doe's

21

statements with respect to certain specific details of the abuse, but she never recanted her report of abuse or denied any touching occurred. And the jury heard the pretext phone call between Morse and Jane Doe, with Morse's statements providing strong evidence to support Jane Doe's testimony.

On this record, we conclude that it was not reasonably probable that, if defense counsel had objected to the prosecution's first set of comments and requested an admonition, Morse would have received a more favorable verdict. And Morse's cursory assertion on the issue of prejudice—that "[a]ny argument that the jury could convict by finding . . . the prosecution's theory 'reasonable' would have been prejudicial"—does not convince us otherwise.

Providing an alternative *Centeno* argument, Morse contends that the prosecutor's third set of comments "argued that if the jury found Jane's testimony 'credible' or 'believable', it would be enough to prove her case beyond a reasonable doubt," and this was objectionable because it told the jury that if there was a reasonable probability Jane Doe was credible, the prosecutor had satisfied her burden of proof. We disagree. The prosecutor argued that the jury could find Jane's testimony true if the jury believed her, and these statements track the jury instructions: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (CALCRIM No. 301.) "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."

22

(CALCRIM No. 1190.)  The prosecutor did not, as Morse contends, additionally argue that jurors could believe Jane and convict Morse if they found there was a reasonable probability that Jane was telling the truth.  In sum, Morse cannot establish that his trial counsel was ineffective for failing to object to the prosecutor's third set of comments.

Finally, Morse briefly contends that his counsel should have objected to the following argument:  "Why would she lie?  Why would she lie about this?  There is nothing in evidence in this case, no reason at all why Jane Doe would want to see her family torn apart, would want to see a man that she looked at like a grandfather arrested, would want to have to talk to perfect strangers over and over and over again about her vagina and his penis and all of these things, these horrible acts that she came in here and testified about.  There is nothing in evidence in this case to suggest why she would do that."  He maintains there was no evidence that Jane Doe was aware of the listed consequences of reporting the molestation or that her family was "indeed 'torn apart.'"  But Morse does not argue in his opening brief that this failure to object caused prejudice, so we reject this final aspect of his ineffective assistance of counsel claim as well.[5]

## DISPOSITION

The judgment is affirmed.

---

[5] In his reply brief, Morse writes that "[a] different outcome would have resulted" had his counsel objected to the "facts not in evidence," but this conclusory argument is forfeited.  (*Gund v. County of Trinity* (2020) 10 Cal.5th 503, 525 [argument forfeited when made for first time in reply].)

BROWN, P. J.

WE CONCUR:

STREETER, J.
SWEET, J.*

*People v. Morse* (A171018)

---

24